Chelsea Stewart-Fusek, OSB # 224994
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Telephone: (971) 717-6425
Email: cstewartfusek@biologicaldiversity.org

Mary Stites, OSB # 225005
NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S. Terwilliger Blvd.
Portland, OR 97219
Telephone: (503) 768-6726
Email: mary@nedc.org

*Attorneys for Plaintiffs*

*[Additional counsel listed at end]*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, **CENTER FOR BIOLOGICAL DIVERSITY**, **THE CONSERVATION ANGLER,** and **WILLAMETTE RIVERKEEPER**, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| **FEDERAL EMERGENCY MANAGEMENT AGENCY; DEANNE CRISWELL**, in her official capacity as Administrator of the Federal Emergency Management Agency; and **ALEJANDRO MAYORKAS**, in his official capacity as Secretary of the U.S. Department of Homeland Security, | |
| Defendants. | |

# I.    INTRODUCTION

1.    Plaintiffs Northwest Environmental Defense Center, Center for Biological Diversity, The Conservation Angler, and Willamette Riverkeeper (collectively "Plaintiffs") challenge the Federal Emergency Management Agency's ("FEMA") continuing operation of the National Flood Insurance Program ("NFIP") in Oregon for violating the Endangered Species Act ("ESA" or "Act") by jeopardizing the continued existence of seventeen ESA-listed species and destroying or adversely modifying the habitat of sixteen of those species.

2.    The NFIP was enacted to provide affordable flood insurance and encourage sensible land use that minimizes the exposure of built structures to flood damage. In reality, the program has encouraged floodplain development in high-hazard areas by providing insurance policies that obscure risk to property owners and provide taxpayer-subsidized, discounted coverage. This FEMA-incentivized development puts people in danger, harms communities, and destroys ecosystems.

3.    FEMA's administration of the NFIP in Oregon causes significant harm to imperiled salmonids, the salmonid-dependent Southern Resident orca ("orca"), and the southern Distinct Population Segment ("DPS") of the Pacific eulachon ("southern eulachon") by encouraging floodplain development that directly and indirectly affects the quantity and quality of fish habitat used for migration, spawning, and rearing, resulting in mortality and contributing to the species' extinction risk. This development alters Oregon's floodplains' natural processes and functions that support these species' freshwater and estuarine life stages, as floodplain development significantly degrades floodplain connectivity, nutrient cycling, and water quantity and quality. Loss of these floodplain functions amplifies the effects of

today's more frequent and severe flooding events, which are often ecologically, economically, and socially costly disasters.

4.    For several decades, FEMA implemented the NFIP in Oregon in violation of the ESA. Indeed, the agency never consulted with the National Marine Fisheries Service ("NMFS") or the U.S. Fish and Wildlife Service on the NFIP's impacts on Oregon's imperiled floodplain-dependent species. Only after a lawsuit, filed in 2009, did FEMA finally consult with NMFS on the effects of their flood insurance-subsidizing activities in Oregon.

5.    As a result of that litigation-driven consultation, in 2016 NMFS released a Biological Opinion ("BiOp") that determined FEMA's implementation of the NFIP in Oregon is jeopardizing the continued existence of some of the state's most iconic species—including fifteen salmonids, the southern eulachon, and the orca—and is destroying or adversely modifying critical habitat for the fish species. This determination is highly significant. Jeopardy and adverse modification decisions are extremely rare and signify that the federal action in question has grave impacts on the survival and potential recovery of our nation's most imperiled wildlife.

6.    In the BiOp, NMFS focused on the discretionary elements of FEMA's NFIP implementation: (1) regulatory floodplain management criteria, (2) floodplain mapping, and (3) the Community Rating System ("CRS") program. The BiOp concluded that these three discretionary components of the program lead to development in floodplains, which in turn destroys habitat in a manner that is "constant, incremental, permanent, and self-propagating." BiOp at 141.

7.    NMFS determined that significant changes to FEMA's implementation of the NFIP are necessary to avoid jeopardy, destruction or adverse modification of critical habitat,

and unlawful "take" of the threatened and endangered species. In a "reasonable and prudent alternative" ("RPA"), the BiOp sets out six elements that will bring the NFIP into compliance with the ESA. Each of these elements has a deadline for implementation. NMFS even anticipated that it would take time for FEMA to implement all of the RPA elements and, to that end, included an element ("E2") that described interim measures that—if timely implemented—would minimize harm to listed species while the other elements were put into place. NMFS' conclusion in its BiOp that FEMA can comply with obligations under Sections 7 and 9 of the ESA hinge on the assumption that FEMA will comply with both the elements of the RPA and the BiOp's Incidental Take Statement ("ITS") issued by NMFS, which allows for take of listed species that is incidental to the continued implementation of the NFIP in Oregon so long as FEMA complies with the conditions in the ITS.

8.   More than seven years later, FEMA continues to administer the NFIP in Oregon in a "business as usual" manner. Ignoring NMFS' BiOp, FEMA has taken no meaningful actions to complete the work mandated in the BiOp or otherwise take alternative protective actions to avoid jeopardy and destruction or adverse modification of critical habitat. Meanwhile, floodplain productivity continues to decline, habitat continues to degrade, and ESA-listed species face an ongoing situation that jeopardizes their very existence. Accordingly, FEMA is in violation of the ITS and Section 7 of the ESA.

9.   Plaintiffs seek (1) a declaration that FEMA has violated its duty under ESA Section 7(a)(2) to ensure that its implementation of the NFIP in Oregon is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species; (2) a declaration that FEMA's failure to implement the vast majority of the RPA or to take alternative protective

measures that ensure its implementation of the NFIP in Oregon is not likely to jeopardize the listed species or result in the destruction or adverse modification of critical habitat, as well as avoid illegal take of listed species, constitutes unlawful withholding or delaying a discrete, nondiscretionary duty under Section 706(1) of the Administrative Procedure Act ("APA"); and (3) such injunctive relief as necessary to enforce FEMA's compliance with Section 7 of the ESA and to ensure that FEMA's implementation of the NFIP in Oregon halts jeopardizing the continued existence of any endangered or threatened species or the destruction or adverse modification of habitat of such species.

## II.    JURISDICTION AND VENUE

10.    Jurisdiction is proper in this Court pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), because this action seeks to enjoin Defendants from further violations of the Act and the regulations promulgated thereunder. Jurisdiction is also proper under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 *et seq.*, the APA, 5 U.S.C. § 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Equal Access to Justice Act, 28 U.S.C. §§ 2201–02.

11.    Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and because Plaintiffs reside in this district. Venue is proper in the Portland Division of this district because a substantial number of impacted species and habitats occur in this division, all four plaintiffs have offices in this division, and because the implementation at issue occurs in Oregon.

12.    The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g)(1) and 5 U.S.C. § 702.

13.     As required by the ESA, Plaintiffs provided Defendants with proper notice of their intent to bring this action more than 60 days prior to filing this lawsuit.

### III.    PARTIES

14.     Plaintiff NORTHWEST ENVIRONMENTAL DEFENSE CENTER ("NEDC") is a nonprofit environmental organization based in Portland, Oregon, and its members include attorneys, law students, and members of the public. NEDC's mission is to preserve and protect the natural environment of the Pacific Northwest by identifying legal and policy solutions to address threats to natural resources. NEDC and its members have specific interests in the continued protection of ESA-listed salmonid species, southern eulachon, and orcas, and in the responsible development of floodplains within the species' habitats.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a national, non-profit conservation organization that works through science, law, and the media to protect imperiled species and their habitats. The Center has more than 89,000 members nationally and more than 3,000 in Oregon, including many who live and recreate in the range of the impacted species and floodplains. The Center is headquartered in Tucson, Arizona, and has an office in Portland, Oregon.

16.     Plaintiff THE CONSERVATION ANGLER ("TCA"), a subsidiary of Wild Salmon Rivers, is a 501(c)(3) non-profit organization originally registered in the state of Washington and licensed in both Oregon and Washington, with an office located in Multnomah County, Oregon. TCA's mission is to protect and conserve wild steelhead, salmon, trout, and char throughout their range in North America and the Russian Far East. TCA operates science, policy, and legal programs to enhance scientific knowledge about these

fish, advocate for policies that conserve them, and hold agencies accountable under the laws that protect wild fish and their habitat.

17.     Plaintiff WILLAMETTE RIVERKEEPER ("WRK") is a 501(c)(3) non-profit organization, founded in 1996, with thousands of members in Oregon and the Pacific Northwest. WRK focuses on protecting and restoring the resources of the Willamette River Basin in Oregon. WRK works on programs and projects ranging from the Clean Water Act compliance and river education to Superfund cleanup and restoring habitat.

18.     Plaintiffs, their staff members, and their members have deep and long-standing interests in the preservation and protection of ESA-listed fish species and Southern Resident orcas, which are directly harmed by Defendants' actions and inactions challenged herein. Plaintiffs' staff and members regularly use waterways and floodplains throughout Oregon, including the area affected by FEMA's implementation of the NFIP, in order to fish for, observe, photograph, study, and enjoy the listed fish species and orcas, and to engage in other personal, recreational, and professional activities. Plaintiffs and their members derive recreational, scientific, aesthetic, spiritual, and economic benefits from these pursuits and the existence in the wild of listed fish species and orcas. Plaintiffs and their members also own floodplain property and rely on FEMA's floodplain mapping to remain informed as to their flood risk and their insurance needs. Plaintiffs will continue to use Oregon waterways and floodplains in 2023 and beyond for these purposes, and their enjoyment will continue to be harmed if the listed species' populations and habitat continue to remain in imperiled condition due to the effects of FEMA's implementation of the NFIP in Oregon.

19.     For instance, Karl Konecny, a TCA board member, has interests in the continued existence of Oregon Coast coho, Lower Columbia River ("LCR") coho, Southern

Oregon/Northern California coho, Middle Columbia River ("MCR") steelhead, Upper Columbia River ("UCR") steelhead, and Snake River Basin steelhead. For 25 years Mr. Konecny has lived on the North Umpqua River, and a portion of his property is within the FEMA-designated Special Flood Hazard Area. Each winter he enjoys observing and photographing wild coho entering the creek to spawn. He has also purchased a boat and fishing gear that he uses to fish for Oregon Coast coho offshore from his property in July and August, approximately two days per week. His property's location and the fishing opportunities it provides are drivers of his property's value. Additionally, Mr. Konecny enjoys fly fishing for the impacted steelhead species weekly and takes trips to fish and camp on Columbia River tributaries two to three times per year, except when fish runs for a particular year are predicted to be too low. Declining fish runs impact Mr. Konecny's ability to enjoy the listed species, and floodplain development spurred by FEMA's implementation of the NFIP in Oregon contributes to declining fish runs and to the factors limiting the species' recovery.

20.    Similarly, Jesse Buss, an NEDC member, has interests in the continued existence of LCR chinook, UCR chinook, LCR steelhead, Upper Willamette River ("UWR") steelhead, and orcas. Growing up in the Willamette Valley, Mr. Buss spent much of his childhood fishing, camping, swimming in rivers, visiting the Oregon coast, and learning how to spot salmon and steelhead. Mr. Buss has traveled to various rivers throughout Oregon to observe these species, including multiple trips to the White Salmon, Molalla, McKenzie, Columbia, and Willamette Rivers, where he has observed numerous salmon and steelhead. Every time Mr. Buss goes to the Oregon coast, he actively looks for Southern Resident orcas, but has yet to spot one. Now, Mr. Buss visits rivers and streams throughout Oregon to fish and

observe for salmon and steelhead and typically takes multiple trips a year in hopes of encountering these species. He enjoys being with and watching these species migrate upstream in their natal waters several times a year. Over the course of his life, Mr. Buss has caught and released numerous wild LCR steelhead. On his recent trips, he wishes he would have been able to catch more, as this would indicate a strengthening native run. Similarly, Mr. Buss has observed many UWR steelhead on the Yamhill River, but has not been able to observe them in high densities in recent years. Mr. Buss is concerned with human-driven biodiversity loss, specifically that which is driving anadromous fish populations to extinction. Further, he worries about how losses of salmon and steelhead negatively impact upland populations of mammals and birds that rely on healthy spawning populations for their own survival. Alongside his personal interest in protecting these species, Mr. Buss's professional work as a public interest environmental attorney involves taking cases aimed at supporting the health of salmon and steelhead populations. Additionally, Mr. Buss co-owns a condo with his wife, which is located adjacent to a mapped floodplain area on FEMA's maps. Mr. Buss believes that the condo might come within an updated, revised floodplain area. He is concerned about the accuracy of the current maps and the damage and reduction of property values that accompanies flooding events.

21.     Michelle Emmons, the community engagement program manager for WRK, works and recreates in the Willamette watershed and has interests in the survival and recovery of UWR chinook and UWR steelhead. Ms. Emmons owns property above the Salmon and Flat Creek drainage areas, which are tributaries of the Middle Fork Willamette, and travels along the Willamette River and its tributaries two to three times per week or more, via hiking, paddling, or fishing, to observe or "catch and release" the fish species. She also enjoys

observing and photographing chinook and steelhead during the spawning season. Ms. Emmons characterizes the species and their Willamette River habitat as "integral" to her life. Her concern for salmon and steelhead survival has changed how she fishes, which she now does only as a catch and release activity, and she no longer bait fishes. She is worried about what the loss of these species would mean for the watershed and is concerned that their extinction would impact the recreation-reliant economy of Oakridge, the small mountain town in which she lives.

22.     Noah Greenwald, endangered species director and member of the Center, has interests in Snake River chinook, Columbia River chum salmon, Snake River sockeye salmon and the southern Distinct Population Segment of the Pacific eulachon. In 1992, Noah worked as an observer on the Columbia River gillnet fishery, spending multiple days on fishermen's boats as they caught salmon, including the above species. Since that time, he has maintained a strong interest in the fate of these fish and the health of the many rivers of the Columbia and Snake River Basins. Noah enjoys rafting rivers in the range of these species, including a float on the Snake River through Hells Canyon in 2015. Noah plans to float the Hanford Reach of the Columbia and the mainstem of the Salmon in the next two years in the hope of seeing one or more of these species. He also regularly visits the Sandy River, where he enjoys the opportunity to observe eulachon and their critical habitat.

23.     FEMA's implementation of the NFIP in Oregon has caused Plaintiffs and their members, including Mr. Konecny, Mr. Buss, Ms. Emmons, and Mr. Greenwald, to suffer concrete and particularized injuries that are actual and imminent. Unless the relief sought in this Complaint is granted, FEMA's implementation of the NFIP in Oregon will continue to contribute to the impacted species' decline toward extinction and Plaintiffs and their members

will continue to suffer injuries to their aesthetic, recreational, spiritual, moral, and economic interests in the continued existence of the listed species.

24.     Defendant FEDERAL EMERGENCY MANAGEMENT AGENCY is an agency within the Department of Homeland Security ("DHS") headquartered in Washington, D.C., and is charged with administering the NFIP.

25.     Defendant DEANNE CRISWELL is the Administrator of the Federal Emergency Management Agency. She is sued in her official capacity.

26.     Defendant ALEJANDRO MAYORKAS is the Secretary of DHS. He oversees FEMA. He is sued in his official capacity.

## IV.    STATEMENT OF LAW

### The National Flood Insurance Program

27.     The NFIP is a federal program administered by FEMA that enables property owners to acquire insurance for properties located in flood-prone areas. Established in 1968 by the passage of the National Flood Insurance Act ("NFIA"), the purpose of the NFIP is two-fold: (1) to provide affordable insurance rates to property owners; and (2) to encourage responsible land use that minimizes the exposure of structures to flood damage by conditioning participation in the program upon the adoption of land-use regulations in accordance with NFIP standards. 42 U.S.C. § 4001.

28.     The NFIA includes strategies to "encourage preventative and protective measures" to minimize the risk borne by flood-prone communities. *See* 82 Stat. 573 for the text in original statute (1392(a) of Pub. L. No. 90-448). Preventative measures are intended to decrease the exposure of a community to flooding events and decrease the fiscal obligations of the NFIP by minimizing the amount of property exposed to flood losses. *Id*.

29.     To meet the purposes of the NFIP, FEMA is charged with: (1) developing comprehensive criteria for land use and management that constricts development of land exposed to flood risk, known as the minimum floodplain management criteria; (2) guiding development away from lands threatened by flood hazards; (3) assisting in reducing damage caused by floods; and (4) otherwise improving the long-range land management and use of flood-prone areas. 42 U.S.C. § 4102(c).

30.     FEMA dictates minimum floodplain management standards and identifies flood hazards by providing Flood Insurance Rate Maps ("FIRMs"). These FIRMs are developed through FEMA's Flood Insurance Studies ("FISs"), which are nationwide studies that identify areas in the United States that have special flood, mudslide, and flood-related erosion hazards; assess flood risk; and designate insurance zones.

31.     FEMA, with the help of participating communities, uses the data from FISs to develop FIRMs that depict a community's flood risk. While FEMA is largely responsible for the creation of each FIRM, the participating community must adopt the map into its local or state law for the map to become effective.

32.     Critical to the FIRMs are the designations of Special Flood Hazard Areas ("SFHAs"). SFHAs are intended to distinguish the flood risk zones that have a one percent or greater chance of flooding in any year. *See* 44 C.F.R. § 59.1.

33.     The FIRMs and subsequent identification of the SFHAs are significant because they help determine both flood insurance rates and whether flood insurance policies are mandatory for property owners.

34.     Communities may avail themselves of NFIP insurance by becoming "participating communities." 42 U.S.C. § 4002(b).

35.     To be a participating community, a locality must adopt land-use regulations in accordance with NFIP standards. *Id*. These standards are intended to encourage sensible development in areas with significant exposure, thereby reducing flood damage to properties built within floodplains.

36.     A participating community is subject to ongoing oversight and enforcement by FEMA to ensure compliance with NFIP standards. FEMA is only permitted to provide flood insurance to communities that have adopted—and abide by—codes that reflect the minimum floodplain management criteria.

37.     If a community adopts the requisite standards and becomes certified for participation, property owners then become eligible for federal flood insurance. 44 C.F.R. §§ 59.22, 59.24. NFIP participating communities are to adopt local land use ordinances to achieve the NFIP's goal of minimizing flood exposure. 42 U.S.C. §§ 4002(b)(3), 4012(c)(2).

38.     Communities participating in the voluntary CRS incentive program adopt floodplain management practices that exceed the minimum requirements, qualifying them for discounts in premium rates of up to 45%. *Id*. § 4022(b), *see also* FEMA, *Community Rating System,* Floodplain Management (2017).

**Endangered Species Act**

39.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its purpose is to "provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such [] species." 16 U.S.C. § 1532(b). The ESA defines "conservation" as the "use of all methods and procedures which are necessary to bring any endangered species or

threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id*. § 1532(3), i.e., to bring about the recovery of species listed as endangered or threatened.

40.     To receive the full protections of the ESA, a species must first be listed by the appropriate expert federal wildlife agency—here, NMFS—as a threatened or endangered species pursuant to ESA Section 4. *See id*. § 1533.

41.     An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range," *id*. § 1532(6), and a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

42.     Once a species is listed, NMFS must designate critical habitat, which is occupied habitat that contains physical or biological features essential to the conservation of the species and which may require species management considerations or protection, or unoccupied habitat that the expert agency has determined is essential for the conservation of the species. *Id*. §§ 1532(5), 1533(a)(3).

43.     A federal agency that authorizes, funds, or carries out an activity that may affect a listed species or designated critical habitat must consult with the appropriate Service over the impacts of that activity to ensure that it does not jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat. *Id.* § 1536(a)(2).

44.     "Jeopardiz[ing] the continued existence of" is defined as "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of the species in the wild by reducing the

reproduction, numbers, or distribution of the species." 50 C.F.R. § 402.2. "Destruction or adverse modification" is "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id*.

45.    During the ESA consultation process, if the action agency concludes in a "biological assessment" or "biological evaluation" that the action will have "no effect" on the species or its critical habitat, concurrence with NMFS is not required, and the process ends. *Id*. C.F.R. § 402.14(a).

46.    On the other hand, if the action agency concludes that the action "may affect" listed species or designated critical habitat, then the action agency must consult with the relevant expert federal wildlife agency. *Id*. The threshold for an agency action to trigger consultation is low.

47.    If the action agency finds that the proposed action "may affect" the species or its critical habitat, but that the action is "not likely to adversely affect" the listed species or adversely modify its critical habitat, and NMFS concurs with that conclusion, consultation is complete. *Id*. §§ 402.12, 402.14(b).

48.    If, however, the action agency or NMFS determine that the activity is "likely to adversely affect" the listed species or its critical habitat, NMFS must develop a "biological opinion" to determine whether the activity will jeopardize the affected species or result in destruction or adverse modification of the affected critical habitat. *Id*. § 402.14(g).

49.    If NMFS determines in the biological opinion that the action will jeopardize the species or destroy or adversely modify critical habitat, it shall suggest one or more RPAs to the agency action that would avoid such results. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

50.    The action agency, in this case FEMA, may deviate from the recommendations contained in a BiOp—for instance by adopting different protective measures that are reasonably adequate to ensure the continued existence of the listed species—but it bears the burden of articulating its reasons for deviation, as well as the burden of explaining how the agency's chosen course of action complies with its obligations under the ESA. The agency's explanation must be well-supported in the record and is subject to the risk of not satisfying its obligation under Section 7(a)(2) to avoid jeopardy to listed species and ensure against destroying or adversely modifying critical habitat.

51.    In addition to the substantive duty under ESA Section 7 to avoid jeopardizing species or destroying or adversely modifying critical habitat, action agencies also have a duty, while the consultation process is occurring, to avoid making an irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures that would avoid jeopardizing the species or adversely modifying critical habitat. 16 U.S.C. § 1536(d).

52.    Section 9 of the ESA and its regulations also prohibit "take" of listed species, which includes harassing, harming, wounding, or killing the species. *Id*. §§ 1538, 1532(19). "Harm" includes significant habitat modification or degradation that kills or injures a listed species by significantly impairing essential behavioral patterns, including breeding, rearing, migrating, feeding, or sheltering.

53.    NMFS can authorize take of a listed species through an ITS that accompanies a BiOp if the taking is incidental to an otherwise lawful activity and does not cause jeopardy to the species or destroy or adversely modify critical habitat. *Id*. § 1536(b)(4); 50 C.F.R. § 402.14(i). The ITS must specify the amount or extent of such incidental taking on the listed

species; any "reasonable and prudent measures" ("RPMs") that NMFS considers necessary or appropriate to minimize such impact; and the "terms and conditions" with which the action agency must comply when it implements those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). Any taking that conforms to the terms and conditions within an ITS is not prohibited under Section 9 of the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

**Administrative Procedure Act**

54.     The APA confers a right of judicial review on any person that is adversely affected by a federal agency action or an agency's failure to act. A reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The APA defines "agency action" to include a "failure to act." *Id.* §§ 551(13), 701(b)(2).

## V.     STATEMENT OF FACTS

**The NFIP Encourages Floodplain Development**

55.     The NFIP "remove[s] economic barriers to development" in floodplains, particularly in coastal and high-growth communities. BiOp at 164 (citations omitted). Indeed, if not for the NFIP, property owners would likely be unable to acquire insurance in flood-prone areas because private insurers have been unwilling to saddle themselves with the high risk associated with developing in floodplains.

56.     Once development occurs in an area, subsequent development often follows. For example, analyses of land use decisions in Oregon's McKenzie River watershed found that "once a development is approved, it usually results in additional development activity." BiOp at 141 (citations omitted). Another analysis showed that in Oregon's Benton County, reliance on existing code provisions that comply with FEMA's floodplain criteria could result in the development of up to 591 floodplain acres over the course of twenty years.

57.     The NFIP also encourages development outside of the FEMA-delineated SFHAs, as structures in these areas are not subject to FEMA's regulatory criteria or the mandate to purchase flood insurance due to their purportedly lower risk of flooding.

58.     But areas outside SFHAs can also face significant exposure to flood events. Many of FEMA's floodplain maps, including many of those for Oregon, are chronically outdated because they are based on decades-old mapping technology and do not use the best available science. These outdated maps thus do not reflect the actual risk of flooding, especially in light of climate change and ongoing development.

59.     As a result, many of the areas outside of the currently-identified SFHAs are often found to be of equal, if not greater, risk of flooding. Approximately 35% of NFIP damage claims in Oregon occur just outside of SFHAs.

60.     Moreover, FEMA has not delineated the regulatory floodway for approximately 77% of the mapped areas in Oregon.

61.     The NFIP also encourages development practices that are highly detrimental to floodplain function. For example, FEMA often permits property owners to raise the base elevation of a structure or lot to "remove" it from the SFHA, thus eliminating the requirement for flood insurance. To elevate the structure or lot, the floodplain is typically "filled" with impervious material such as pavement. The practice of filling floodplains to elevate lots from SFHAs is problematic because the filling reduces the floodplain's capacity for water storage by displacing the water that would have otherwise inundated the filled area during flood events; i.e., the water that is displaced by an elevated structure or lot must go somewhere and is often displaced onto neighboring properties. Additionally, during periods of rapid inundation, areas of the floodplain that have been compacted due to development no longer

have the capacity to absorb the rapid influx of water, increasing the flood risk of nearby structures.

62.     Providing low-rate, taxpayer-funded insurance has encouraged tens of millions of people to live in areas of extreme risk of flooding, subjecting them to losses of life and property. These risks are increasing as climate change and sea level rise increase the frequency and intensity of flooding events.

63.     As of December 2022, the NFIP had nearly 5 million flood insurance policies, accounting for over $1.3 trillion in coverage. In Oregon, as of March 2021, there were 24,900 NFIP policies in force.

64.     The NFIP's annual financial losses are significant and increase as the frequency of severe storms increase; for instance, in 2014 the program lost $380 million, and in 2017, the program lost over $10 billion. Currently the NFIP is more than $22.5 billion in debt and, as of September 30, 2022, had nearly $6.3 billion in unpaid Loss & Loss Adjustment Claims. In 2022, American taxpayers paid over $280 million in interest on that debt.

65.     Because the NFIP encourages development in the floodplain and affects listed species and their critical habitat, FEMA was required to engage in formal consultation with NMFS. NMFS found that the program allows for "largely unrestricted floodplain development" while continuing to credit activities that adversely affect habitat function. BiOp at 208. The NFIP's regulatory criteria, mapping procedures, and CRS include components that directly and indirectly affect the amount of development that occurs in floodplains.

**The Effects of Development on Natural Floodplain Function**

66.     Throughout Oregon, development in urban and rural areas replaces complex riparian ecosystems and intact floodplains with simplified channels and disconnected aquatic habitats. This elimination of natural floodplain function has a cascade of effects. For instance, in a naturally functioning system, flooding provides fish with access to a diverse range of habitats; development that reduces the frequency of floodplain inundation, however, can cut off fish access to the floodplain altogether. So-called "floodplain encroachment"—the process by which natural floodplains are replaced with man-made material and structures—converts complex habitat mosaics into smooth, uniform channels and "eliminates numerous species dependent on a physically diverse substrate for shelter, reproduction, or food," "affect[ing] all trophic levels." BiOp at 147 (citations omitted). Floodplain encroachment results in permanent, deleterious impacts on nutrient cycling, system productivity, and biodiversity, and the destruction of natural erosion processes.

67.     Encroachment likewise has significant effects on water quality and quantity. Fill, dikes, levees, and other forms of development eliminate connections between surface and groundwater. This disconnection eliminates a crucial source of cooling because natural floodplain inundation recharges groundwater aquifers with cold water that later comes to the surface. Development also reduces water availability and increases the input of pollutants—including from sediment, pesticides, herbicides, fertilizers, gasoline, and other contaminants—causing a cascade of effects by harming the aquatic life relied upon by species higher in the food chain, such as salmon and Southern Resident orcas.

68.     Floodplain development increases the severity of flooding because filling floodplains results in the loss of floodplain storage which diminishes a floodplain's ability to

absorb water in periods of rapid inundation. Subsequently, displaced water—traveling at rapid speeds—often flows into areas that include infrastructure such as roads and neighborhoods, wreaking havoc on communities. Inundation of areas that contain infrastructure also exposes fish to myriad contaminants associated with residential and industrial uses, such as herbicides, fertilizers, pesticides, and petroleum products. Further, when the river channel is disconnected from the floodplain, floodplain-dependent species are left without refuge from high-velocity flows.

69.     These and other impacts of floodplain development are and will continue to be exacerbated by the effects of the global climate crisis. Nationally, 70% of flood increases are attributed to climate change. Going forward, climate change is projected to significantly alter Oregon's hydrology—for instance, by 2100, riverine flood depths and flood areas in the Pacific Northwest are projected to increase by over 100% in some areas. As winter precipitation increasingly falls as rain rather than snow, the effects of the watershed's inability to cope with flood water due to floodplain loss will likely result in flooding of unprecedented magnitudes.

**ESA-listed, Floodplain-Dependent Species in Oregon**

70.     There are sixteen ESA-listed anadromous fish species in Oregon that are imperiled by the impacts of floodplain development. Anadromous fish are those that hatch and rear in freshwater, migrate downstream to the Pacific Ocean to grow into adults, and return to the freshwater in which they hatched to spawn and die.

71.     These fish are: Snake River sockeye salmon, 56 Fed. Reg. 58619 (Nov. 20, 1991) (endangered); UWR chinook salmon, 70 Fed. Reg. 37160 (June 28, 2005) (threatened); LCR chinook, 70 Fed. Reg. 37160 (June 28, 2005) (threatened); UCR Spring chinook, 70 Fed.

Reg. 37160 (June 28, 2005) (endangered); Snake River Spring/Summer chinook, 70 Fed. Reg. 37160 (June 28, 2005) (threatened); Snake River Fall chinook, 70 Fed. Reg. 37160 (June 28, 2005) (threatened); LCR coho salmon, 70 Fed. Reg. 37160 (June 28, 2005) (threatened); Southern Oregon/Northern California coho, 70 Fed. Reg. 37160 (June 28, 2005) (threatened); Oregon Coast coho, 73 Fed. Reg. 7816 (Feb. 11, 2008) (threatened); Columbia River chum salmon, 70 Fed. Reg. 37160 (June 28, 2005) (threatened); UWR steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (threatened); LCR steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (threatened); MCR steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (threatened); UCR steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (threatened); Snake River Basin steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (threatened); and the southern eulachon, 75 Fed. Reg. 13012 (Mar. 18, 2010) (threatened).

72.     Southern Resident orcas are also dependent on intact floodplains because they feed almost exclusively on the floodplain-dependent chinook salmon. Southern Resident orcas were listed as an endangered species in 2005. 70 Fed. Reg. 69903 (Nov. 18, 2005).

73.     Each of these fish species has designated critical habitat in Oregon. *See* 58 Fed. Reg. 68543 (Dec. 28, 1993) (Snake River sockeye and Snake River Fall chinook); 70 Fed. Reg. 52630 (Sept. 2, 2005) (Columbia River chum, three ESUs of chinook, and five DPSs of steelhead in Oregon); 64 Fed. Reg. 57399 (Oct. 25, 1999) (Snake River Spring/Summer chinook); 64 Fed. Reg. 24049 (May 5, 1999) (Southern Oregon/Northern California Coast coho); 81 Fed. Reg. 9252 (Feb. 24, 2016) (LCR coho); 73 Fed. Reg. 7816 (Feb. 11, 2008) (Oregon Coast coho); 76 Fed. Reg. 65324 (Oct. 20, 2011) (southern eulachon).

74.     These listed species require intact riparian ecosystems, including naturally functioning floodplain habitat, for their survival and recovery. Indeed, while river channel habitats support large fisheries, "the highest yields are associated with adjoining floodplains

and most of their production is derived from floodplain habitats." BiOp at 142 (internal

citations omitted).

75.    NMFS identifies loss of floodplain function and connectivity, loss of wetlands,

loss of channel structure and complexity, loss of estuarine and tidal freshwater habitat, altered

hydrology and sediment routing, degraded riparian areas, and degraded water quality and food

web complexity as key factors limiting the recovery of the listed fish. Consequently, the

recovery of orcas—which feed almost exclusively on chinook salmon—is limited by the

reduction in prey quantity and quality caused by loss of floodplain function.

**Prior Litigation**

76.    In 2009, NEDC, Audubon Society of Portland, National Wildlife Federation,

and Association of Northwest Steelheaders sued FEMA for the agency's failure to consult

with NMFS on the impacts of FEMA's implementation of the NFIP in Oregon on the above-

mentioned ESA-listed species in violation of Section 7 of the ESA. *Audubon Soc'y of

Portland v. Fed. Emergency Mgmt. Agency*, Case No. 3:09-cv-729-HA (D. Or. 2010).

77.    In 2010, the parties reached a settlement agreement that required FEMA to

request consultation on three aspects of the NFIP: (1) implementation of 42 U.S.C. § 4102(c),

which mandates that FEMA use land use criteria to reduce development in flood-prone areas;

(2) mapping of floodplains and revisions thereof pursuant to 42 U.S.C. 4101(a)(1); and (3),

the implementation of the CRS pursuant to 42 U.S.C. § 4022(b)(1).

78.    FEMA began consultation in August of 2012.

**NMFS's 2016 Biological Opinion**

79.    NMFS concluded in its BiOp, issued on April 14, 2016, that FEMA's

implementation of the NFIP in Oregon was likely to jeopardize the continued existence of the

ESA-listed anadromous fish species and Southern Resident orcas and would result in the destruction or adverse modification of designated or proposed critical habitat for the fish species.

80.    The BiOp concluded that:

> The NFIP, through the [regulatory floodplain management criteria, floodplain mapping, and CRS program], leads to development in the floodplain environment. The reduction in floodplain habitat function is constant, incremental, permanent, and self-propagating. Once development occurs in an area, subsequent development follows.

BiOp at 141.

81.    NMFS further identified several "weaknesses" in the NFIP that render the program "likely to increase mortality and decrease fitness of anadromous fishes that occupy floodplains and the adjacent stream or river," and concluded that "FEMA's [implementation of the NFIP] does not provide the necessary assurances that [its effects] will not appreciably reduce the likelihood of both the survival and recovery of the affected species." *Id*. at 142. Specifically, the BiOp found that the development effects of the NFIP are "(1) predominantly negative, permanent, and aggregating over time; (2) likely to outpace floodplain restoration activities; and (3) likely to adversely affect multiple life stages, across multiple generations." *Id*. at 211.

82.    For instance, the recovery of the threatened LCR chinook salmon—of which just two of its 32 populations were considered viable at the time of the BiOp's issuance—is limited by degraded riparian and floodplain conditions, modified channel structure, the reduction of side channels and reduced wetland conditions, degraded sediment conditions, unsuitable water temperature and flow, toxic pollutants, and poor estuary condition. The BiOp found that the NFIP contributes to each of these limiting factors and is likely to impact all life

history stages, all life history strategies, and all populations of the LCR chinook, increasing the extinction risk for multiple populations.

83.     The BiOp made similar findings for the other fish species. For example, the BiOp found that the highest priority for protecting the biological productivity of UCR steelhead is to allow unrestricted stream channel migration, complexity, and floodplain function—limiting factors to recovery that are detrimentally impacted by the NFIP, particularly in the estuary. The BiOp also found that the effects of the NFIP will exacerbate the anticipated habitat changes associated with climate change, for UCR steelhead rely heavily on streams and changes in water temperature in streams lacking intact riparian vegetation may cause "the near total loss" of rearing habitat. BiOp at 229.

84.     Southern Resident orcas are jeopardized by the NFIP due to the program's effects on salmonids because they feed almost exclusively on chinook salmon due to their size and high fat content. As chinook continue to decline, orcas will be subject to the effects of food scarcity, causing them to travel longer distances in search of abundant prey, resulting in an increase in energy demands and a subsequent decrease in fitness. Moreover, as chinook are exposed to persistent pollutants, Southern Resident orcas will not only continue to experience a reduction in prey availability but will also continue to bioaccumulate toxins from consuming contaminated fish. These toxins accumulate in Southern Resident orcas' fat stores, which could be drawn upon in times of prey scarcity.

85.     Given that FEMA's operation of the NFIP in Oregon was found to jeopardize listed species and destroy or adversely modify their critical habitat, NMFS provided an RPA that, if implemented, would allow FEMA to administer the NFIP in Oregon without violating the ESA. The RPA is composed of six elements:

1. Notice, education, and outreach to NFIP participating communities in Oregon regarding the outcome of FEMA's consultation with NMFS on the implementation of the NFIP in Oregon.

2. Interim measures that FEMA and its NFIP participating communities can promptly implement to reduce the impacts of floodplain development on natural floodplain functions needed to support listed species. These interim measures are to be implemented during the 8.5-year time frame anticipated for FEMA to complete the mapping updates and implement the modifications to the NFIP's minimum criteria and reporting requirements identified in elements 2 through 5 of the RPA.

3. Revised mapping protocols to improve the identification of special hazard areas, including channel migration zones and areas of future risk.

4. Revised floodplain management criteria to provide greater certainty that the impacts of development in areas of high hazard will be avoided, minimized, and mitigated to protect natural floodplain functions.

5. Data collection and reporting requirements needed to accurately track floodplain development impacts and RPA implementation.

6. Compliance and enforcement strategies to ensure that effects of floodplain development pursuant to the NFIP are avoided or reduced throughout the action area.

BiOp at 274–75.

86.    NMFS emphasized that these "measures [were] identified as necessary to ensure that the NFIP avoids jeopardy to listed species and avoids destruction and adverse modification of critical habitat for those species." *Id*. at 277. NMFS also stressed the importance of E2, which was to be implemented "as soon as possible" to "ensure that existing natural floodplain functions are maintained pending full RPA implementation." *Id*. at 278.

87.    Given that FEMA's implementation of the NFIP in Oregon results in the incidental take of listed species, NMFS issued an ITS. Due to difficulties in articulating an express number of fish that may be injured or killed, NMFS described expected levels of take in terms of expected floodplain development per county, measured in acres. This acreage was determined by the proportion of currently delineated SFHA acres by county that may be

temporarily and/or permanently disturbed due to floodplain development activities. The amount of taking includes 14,704 acres of development distributed amongst the counties of the state (*see, e.g.*, BiOp at 321, granting Multnomah County 308 acres of floodplain development). If a county exceeds their allotted acreage of development, then the extent of take allowed by the ITS is exceeded and further take is not be covered by the ITS's Section 9 liability coverage.

88.    The ITS assumed that FEMA would implement the RPA laid out in the BiOp. NMFS asserted that take of the anadromous fish species would still occur after the RPA was fully implemented, but to an extent not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat. The ITS did not cover Southern Resident orcas because NMFS concluded that implementation of the RPA would negate a significant amount of harm the NFIP causes to chinook salmon, the Southern Resident orca's main prey base.

89.    The ITS also included RPMs and terms and conditions that consisted of reporting requirements relating to FEMA's implementation of the RPA.

90.    Pursuant to Section 7(a)(1), NMFS additionally issued conservation recommendations for FEMA to enact, including strengthening regulatory foundations for ESA compliance, improving levee habitat quality, making CRS modifications to protect natural floodplain functions in part by incentivizing communities to take greater protective steps, and establishing minimum lot size for flood hazard areas.

**Delays in RPA Implementation**

91.    The BiOp included a series of deadlines for implementation of the RPA. E2's interim measures were to be in effect by March 15, 2018, and measures pertaining to E4 were to be in effect by January 1, 2019. NMFS contemplated a level of trial and error necessary for

effective implementation and, as such, accounted for time to make regulatory revisions. Accordingly, full implementation was to be achieved by January 1, 2021.

92.     Following the BiOp's issuance, FEMA sent a letter to the 260 participating communities in Oregon informing them of NMFS' jeopardy determination, satisfying E1 of the RPA.

93.     In 2018, Congress enacted a three-year deadline extension for FEMA to implement the RPA. Disaster Recovery Reform Act of 2018, Pub. L. No. 115-254, §1246, 132 Stat. 3185, 3469 (2018). Consequently, the deadline to implement E2's interim measures became March 15, 2022, with full implementation, including any necessary regulatory revisions, occurring by January 1, 2024.

94.     Despite Congress providing FEMA an additional three years to bring its implementation of the NFIP in Oregon into compliance with the ESA, FEMA has yet to implement the remaining RPA elements other than E1, including the interim measures set out in E2.

95.     Instead, seven years after the BiOp's issuance, FEMA only recently began to develop a Draft Implementation Plan for the NFIP in Oregon, which is currently in the initial stages of National Environmental Policy Act ("NEPA") review.

96.     Additional delays in implementation of the RPA place FEMA in ongoing violation of the ESA.

97.     Since the BiOp was issued in 2016, the seventeen ESA-listed species impacted by FEMA's implementation of the NFIP in Oregon have largely continued to decline. NMFS's 2022 5-year review of the status of Oregon's salmonids—a study that tracks species' progress toward recovery goals—found that most populations are still far from their recovery

goals. For instance, for the LCR coho salmon, slight improvements in populations' spatial structure and diversity have been overshadowed by declines in abundance and productivity. Its viability is unchanged from NMFS's 2015 review, with the species remaining at "moderate" risk of extinction. NMFS also found that of the seventeen Columbia River chum salmon populations, fourteen have abundances that are unlikely to be more than 10% of the established recovery goals, and most populations are threatened by projected increases in land development in the Vancouver-Portland area and in the lower Columbia River area generally. And between the two most recent review periods, return numbers for Snake River sockeye salmon declined from 137 to just 16 fish. Southern Resident orcas also remain on a path to extinction. Their remarkably low numbers have declined even further since the BiOp was produced, from 83 to just 74 individuals.

## VI. FIRST CLAIM FOR RELIEF

### FEMA'S FAILURE TO ENSURE AGAINST JEOPARDY AND DESTRUCTION OR ADVERSE MODIFICATION OF HABITAT UNDER ESA SECTION 7

98.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

99.     Section 7 of the ESA requires FEMA to ensure, through consultation with NMFS, that FEMA's actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

100.    Seven years ago, NMFS found that FEMA's implementation of the NFIP in Oregon jeopardizes the continued existence of seventeen ESA-listed species and destroys or adversely modifies the habitat of sixteen of those species.

101.    NMFS set forth an RPA detailing actions for FEMA to take to bring its NFIP implementation in Oregon into compliance with Section 7(a)(2). NMFS also set forth a series of deadlines for the RPA's implementation.

102.    FEMA has not implemented a vast majority of the RPA and most of the deadlines have passed.

103.    FEMA's failure to complete its implementation of the RPA—despite having seven years to do so—or to take other protective actions to significantly reduce the impact of its implementation of the NFIP in Oregon means that FEMA continues to jeopardize the listed species and to destroy or adversely modify their habitat.

104.    Accordingly, FEMA has failed to ensure that FEMA's implementation of the NFIP in Oregon "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat," *id*., and FEMA's implementation of the NFIP in Oregon continues to jeopardize seventeen ESA-listed species and destroy or adversely modify the habitat of sixteen of those species in violation of the ESA.

105.    FEMA's violations of ESA Section 7 are actionable pursuant to the ESA's citizen suit provision. 16 U.S.C. § 1540(g).

## VII. SECOND CLAIM FOR RELIEF

## FEMA HAS UNLAWFULLY DELAYED OR UNREASONABLY WITHHELD TAKING ACTION TO ENSURE ITS COMPLIANCE WITH ESA SECTION 7

106.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

107.    Section 7 of the ESA requires FEMA to ensure that any action authorized, funded, or carried out by such agency is "not likely to jeopardize the continued existence of

any endangered species or threatened species or result in the destruction or adverse modification of habitat." *Id*. U.S.C. § 1536(a)(2).

108.    FEMA's implementation of the NFIP in Oregon is an action that NMFS has determined is likely to jeopardize seventeen ESA-listed species and destroy or adversely modify the habitat of sixteen of those species.

109.    In order to avoid jeopardizing these species or destroying or adversely modifying their habitat, NMFS included a series of deadlines for implementation of the RPA in the BiOp issued on April 16, 2016. E2's interim measures were to be in effect by March 15, 2018, and measures pertaining to E4 were to be in effect by January 1, 2019. Full implementation was to be achieved by January 1, 2021.

110.    In 2018, Congress enacted a three-year deadline extension for FEMA to implement the RPA. Consequently, the deadline to implement E2's interim measures became March 15, 2022, with full implementation of the RPA occurring by January 1, 2024.

111.    Despite Congress providing FEMA an additional three years to bring the implementation of the NFIP in Oregon into compliance with the ESA, FEMA has implemented just one element—that which required it to inform participating communities of the BiOp's issuance—of the six-element RPA.

112.    FEMA's refusal and failure to implement the other elements of the RPA, or other reasonably adequate protective measures, constitutes an agency action "unlawfully withheld or unreasonably delayed" under the APA.

113.    A "reviewing court shall … compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.§ 706(1).

114.    Accordingly, the Court shall compel such action under the APA, 5 U.S.C § 706(1), and issue declaratory, injunctive, and/or other relief ordering FEMA to immediately implement the RPA.

## PRAYER FOR RELIEF

A.    Declare that FEMA is violating its duty under ESA Section 7(a)(2) to ensure that its implementation of the NFIP in Oregon is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species;

B.    Declare that FEMA's failure to implement the vast majority of the RPA or to take alternative measures that ensure its implementation of the NFIP in Oregon is not likely to jeopardize the listed species or result in the destruction or adverse modification of critical habitat constitutes unlawful withholding or delaying a discrete, nondiscretionary duty under Section 706(1) of the APA;

C.    Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs, such as injunctive relief pending FEMA's implementation of E2's interim measures;

D.    Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*; and

E.    Grant such further relief as the Court deems just and proper in order to provide Plaintiffs with relief and protect the public interest.

RESPECTFULLY SUBMITTED this 14th day of September, 2023.

/s/ Chelsea Stewart-Fusek
Chelsea Stewart-Fusek, OSB # 224994
CENTER FOR BIOLOGICAL DIVERSITY
P.O. BOX 11374
Portland, OR 97211
Telephone: (971) 717-6425
Email: cstewartfusek@biologicaldiversity.org
*Attorney for Center for Biological Diversity*

/s/ Mary Stites
Mary Stites, OSB # 225005
NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S. Terwilliger Blvd.
Portland, OR 97219
Telephone: (503)-768-6726
Email: mary@nedc.org
*Attorney for Northwest Environmental Defense Center*

/s/ Ryan Shannon
Ryan Shannon, OSB # 155537
CENTER FOR BIOLOGICAL DIVERSITY
P.O. BOX 11374
Portland, OR 97211
Telephone: (971) 717-6407
Email: rshannon@biologicaldiversity.org
*Attorney for Center for Biological Diversity*

/s/ Robert Kirschner, Jr.
Robert Kirschner, Jr. OSB # 074399
THE CONSERVATION ANGLER
3241 NE 73rd Ave.
Portland, OR 97213
Telephone: (503) 894-0439
Email: rob@theconservationangler.org
*Attorney for The Conservation Angler*

/s/ Lindsey Hutchison
Lindsey Hutchison, OSB # 214690
WILLAMETTE RIVERKEEPER
1210 Center St.
Oregon City, OR 97045
Telephone: (971) 369-7590
Email: lindsey@willametteriverkeeper.org
*Attorney for Willamette Riverkeeper*