TODD KIM, Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
MARK ARTHUR BROWN
D.C. Bar No. 470050
Wildlife and Marine Resources Section
4 Constitution Square
150 M Street, N.E.
Washington, D.C. 20002
Tel: 202-305-0204
mark.brown@usdoj.gov

*Attorneys for Defendants*

*[Additional counsel listed at end]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL DEFENSE CENTER; CENTER FOR BIOLOGICAL DIVERSITY; THE CONSERVATION ANGLER; and WILLAMETTE RIVERKEEPER,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FEDERAL EMERGENCY MANAGEMENT AGENCY; DEANNE CRISWELL, in her official capacity as Administrator of the Federal Emergency Management Agency; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the U.S. Department of Homeland Security,**<br><br>**Defendants.** | **Case No. 3:23-cv-01335-SI** |

## DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 19) AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGE

I. INTRODUCTION ......................................................................................................... 1

II. STATUTORY BACKGROUND ................................................................................... 2

    A. The National Flood Insurance Act and the National Flood Insurance Program .................. 2

        1. FEMA's Floodplain Management Criteria ......................................................... 4

        2. Community Rating System ................................................................................. 5

        3. FEMA's Floodplain Mapping Mandate ............................................................. 6

        4. Letters of Map Change ....................................................................................... 7

    B. The Endangered Species Act ....................................................................................... 9

III. FACTUAL BACKGROUND ....................................................................................... 12

    A. The 2016 BiOp and RPA .............................................................................................. 12

    B. Development of RPA Integration Plan ......................................................................... 14

    C. Draft Integration Plan and Scoping Process ................................................................ 17

    D. Pre-Implementation Compliance Measures ................................................................ 18

    E. FEMA's Other Program Changes to the NFIP in Oregon .......................................... 19

IV. STANDARD OF REVIEW ........................................................................................... 20

V. ARGUMENT .................................................................................................................. 22

    A. Plaintiffs' Claims Concerning "Full Implementation" of the NMFS-Recommended
        RPA Are Unripe. ........................................................................................................... 23

    B. The Court lacks subject-matter jurisdiction over Plaintiffs' duplicative APA claim
        concerning alleged unreasonable delay. ...................................................................... 26

    C. FEMA's RPA Pre-Implementation Compliance Measures Ensure Against Jeopardy
        and Destruction or Adverse Modification of Habitat Under ESA Section 7
        (First Claim for Relief) ................................................................................................. 28

        1. RPA Element 1 ................................................................................................... 29

2. RPA Element 2 and the PICMs ............................................................. 30

a. RPA Elements 2A-2B ............................................................. 31

b. RPA Elements 2C-2D ............................................................. 32

c. RPA Element 2E ............................................................. 33

d. RPA Element 2F ............................................................. 33

e. RPA Element 3 ............................................................. 35

f. RPA Element 4 ............................................................. 37

g. RPA Element 5 ............................................................. 40

h. RPA Element 6 ............................................................. 41

D. FEMA Has Not Unreasonably Delayed Compliance with its ESA
   Section 7 Obligations. ............................................................. 43

VI. CONCLUSION ............................................................. 46

## TABLE OF AUTHORITIES

**CASE**                                                                                      **PAGE(S)**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ........................................................................................ 24

*Alaska Dep't of Env't Conservation v. EPA*,
   540 U.S. 461 (2004) ........................................................................................ 29

*Allegheny Cnty. Sanitary Auth. v. EPA*,
   732 F.2d 1167 (3d Cir. 1984) ......................................................................... 27

*American Canoe Ass'n v. EPA*,
   30 F.Supp.2d 908 (E.D. Va. 1998) ................................................................. 27

*Asarco, Inc. v. EPA*,
   616 F.2d 1153 (9th Cir. 1980) ....................................................................... 43

*Audubon Society of Portland v. FEMA*,
   Case No. 3:09-cv-729-HA (D. Or.) ................................................................ 12

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983) .................................................................................... 36, 43

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................. passim

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ........................................................................................ 27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................ 22

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................ 34

*Daly v. Volpe*,
   514 F.2d 1106 (9th Cir. 1975) ....................................................................... 34

*Defs. of Wildlife v. U.S. Fish and Wildlife Serv.*,
   797 F. Supp. 2d 949 (D. Ariz. 2011) ............................................................. 28

*Env't Def. Fund v. Tidwell*,
   837 F. Supp. 1344 (E.D. N.C. 1992) ............................................................. 27

*Nat. Res. Def. Council v. EPA,*
859 F.2d 156 (1988) ........................................................................... 25

*Greater Yellowstone Coal. v. Servheen,*
665 F.3d 1015 (9th Cir. 2011) ........................................................... 21

*Haw. Cnty. Green Party v. Clinton,*
124 F. Supp. 2d 1173 (D. Haw. 2000) .............................................. 27

*In Re Natural Resources Defense Council, Inc.,*
956 F.3d 1134 (9th Cir. 2020) ........................................................... 44

*In Re United Mine Workers of Am. Int'l Union,*
190 F.3d 545 (D.C. Cir. 1999) ........................................................... 44

*Jacobson v. Massachusetts,*
197 U.S. 11 (1905) ............................................................................... 3

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
681 F.3d 1006 (9th Cir. 2012) ........................................................... 21

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) ........................................................................... 42

*McCrary v. Gutierrez,*
528 F. Supp. 2d 995 (N.D. Cal. 2007) .............................................. 27

*National Wildlife Fed'n v. Coleman,*
529 F.2d 359 (5th Cir. 1976) ............................................................. 11

*Nat'l Wildlife Fed'n v. FEMA,*
No. C11-2044-RSM, 2014 WL 5449859 (W.D. Wash. Oct. 24, 2014) .......................... passim

*Nat'l Parks Hosp. Ass'n v. Dep't of Interior,*
538 U.S. 803 (2003) ........................................................................... 25

*North Slope Borough v. Andrus,*
642 F.2d 589 (D.C. Cir. 1980) ........................................................... 11

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ....................................................................... 21, 27

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,*
479 F. Supp. 3d 1003 (D. Or. 2020) ............................................. 35, 42

*Nw. Res. Info. Ctr. v. NMFS,*
  56 F.3d 1060 (9th Cir. 1995) ........................................................................ 9

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) ................................................................................... 24

*Oregonians for Floodplain Prot. v. U.S. Dep't of Com.,*
  334 F. Supp. 3d 66 (D.D.C. 2018) ............................................................. 25

*Pyramid Lake Paiute Tribe of Indians v. United States,*
  898 F.2d 1410 (9th Cir. 1990) .................................................................... 28

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) .......................................................... 21, 22, 30

*Sierra Club v. Froehlke,*
  534 F.2d 1289 (8th Cir. 1976) .................................................................... 12

*Sierra Club v. Thomas,*
  828 F.2d 783 (D.C. Cir. 1987) .................................................................... 44

*Sw. Ctr. for Biological Diversity v. Babbitt,*
  No. CIV. 97-0474 PHX-DAE, 2000 WL 33907602 (D. Ariz. Sept. 26, 2000) ....................... 35

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,*
  143 F.3d 515 (9th Cir. 1998) ...................................................................... 10

*Telecommunications Research & Action Center v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984) ................................................................ 44, 45

*Toilet Goods Ass'n v. Gardner,*
  387 U.S. 158 (1967) ................................................................................... 24

*Tribal Vill. of Akutan v. Hodel,*
  869 F.2d 1185 (9th Cir. 1989) .............................................................. passim

*Vill. of False Pass v. Watt,*
  565 F. Supp. 1123 (D. Alaska 1983) .................................................... 11, 30

*W. Watersheds Project v. Kraayenbrink,*
  632 F.3d 472 (9th Cir. 2011) ...................................................................... 21

*Willamette Riverkeeper v. U.S. Army Corps of Eng'rs,*
  No. 6:17-cv-00801-MC, ECF No. 28 (D. Or. Feb. 28, 2018) .............................. 21

## STATUTES

5 U.S.C. § 704 ..................................................................................................... 21, 26

5 U.S.C. § 706 ........................................................................................................... 20

5 U.S.C. § 706(1) ................................................................................................ passim

5 U.S.C. § 706(2) ....................................................................................................... 20

5 U.S.C. § 706(2)(A) .................................................................................................. 21

16 U.S.C. § 1532(20) ................................................................................................... 9

16 U.S.C. § 1532(6) ..................................................................................................... 9

16 U.S.C. § 1532(15) ................................................................................................... 9

16 U.S.C. § 1533(a) ..................................................................................................... 9

16 U.S.C. § 1536(a)(2) ............................................................................... 2, 9, 11, 12

16 U.S.C. § 1536(b) ..................................................................................................... 9

16 U.S.C. § 1536(b)(3)(A) ......................................................................................... 10

16 U.S.C. § 1540(g) ................................................................................................... 20

16 U.S.C. § 1540(g)(1) ......................................................................................... 20, 26

16 U.S.C. § 1540(g)(1)(A) ......................................................................................... 12

42 U.S.C. § 4001 .......................................................................................................... 2

42 U.S.C. § 4001(d) ..................................................................................................... 3

42 U.S.C. § 4001(e) ..................................................................................................... 3

42 U.S.C. § 4003(a)(1) ................................................................................................. 1

42 U.S.C. § 4012 .......................................................................................................... 4

42 U.S.C. § 4012(c) ..................................................................................................... 3

42 U.S.C. § 4022(a) ..................................................................................................... 3

42 U.S.C. § 4022(b) .................................................................................................. 5, 6

42 U.S.C. § 4022(b)(1)(A) ........................................................................................... 6

42 U.S.C. § 4101 .......................................................................................................... 6

42 U.S.C. § 4101(a) ..................................................................................................... 6

42 U.S.C. § 4101(e)-(f) ............................................................................................... 7

42 U.S.C. § 4101(f) ..................................................................................................... 7

42 U.S.C. § 4101(h) ..................................................................................................... 7

42 U.S.C. § 4102(c) ................................................................................................ 4, 31

42 U.S.C. § 4128 ............................................................................................ 4

44 U.S.C. § 3501 .......................................................................................... 40

Pub. L. No. 93-234 (1973) ............................................................................ 2

Pub. L. No. 103-325 (1994) .......................................................................... 2

Pub. L. No. 112-141(2012) ........................................................................... 3

Pub. L. No. 113-89 (2014) ............................................................................ 3

Pub. L. No. 115-254 (2018) ...................................................................... 1, 15

## RULES

Fed. R. Civ. P. 56(a) ................................................................................... 22

## REGULATIONS

40 C.F.R. § 1501.10(b)(2) ........................................................................... 17

40 C.F.R. § 1502.9 ...................................................................................... 18

40 C.F.R. § 1503.4 ...................................................................................... 18

40 C.F.R. § 1505.2 ...................................................................................... 18

40 C.F.R. § 1506.10 .................................................................................... 18

40 C.F.R. § 1506.10(d) ............................................................................... 18

40 C.F.R. § 1502.20 .................................................................................... 17

44 C.F.R. pt. 59 ............................................................................................ 6

44 C.F.R. § 59.1 ....................................................................................... 5, 6

44 C.F.R. § 59.2(b) ................................................................................... 4, 5

44 C.F.R. § 59.22(a)(3) ................................................................................ 4

44 C.F.R. § 59.24(b)-(c) .................................................................. 5, 19, 38

44 C.F.R. pt. 60 .......................................................................................... 37

44 C.F.R. § 60.1 ........................................................................................... 4

44 C.F.R. § 60.1(a) ...................................................................................... 3

44 C.F.R. § 60.3 ........................................................................................... 5

44 C.F.R. § 60.3(a) ...................................................................................... 5

44 C.F.R. § 60.3(c) ...................................................................................... 7

44 C.F.R. §§ 65.4-65.8 ................................................................................. 7

44 C.F.R. §§ 65.4-65.6 ........................................................................................... 7

44 C.F.R. pt. 70 ............................................................................................... 7, 8

44 C.F.R. pt. 72 .................................................................................................. 7

44 C.F.R. § 72.2 .............................................................................................. 7, 8

50 C.F.R. pt. 402 ................................................................................................ 9

50 C.F.R. § 402.02 ........................................................................................... 10

50 C.F.R. § 402.13(c) ...................................................................................... 10

50 C.F.R. § 402.14(a) .................................................................................... 9, 10

50 C.F.R. § 402.14(h) ...................................................................................... 10

50 C.F.R. § 402.15(a) ...................................................................................... 10

50 C.F.R. § 402.15(b) ................................................................................. 10, 11

## FEDERAL REGISTER

41 Fed. Reg. 46975 (Oct. 26, 1976) ................................................................... 4

51 Fed. Reg. 19926 (June 3, 1986) .................................................................. 11

88 Fed. Reg. 13841 (March 6, 2023) ................................................................ 17

88 Fed. Reg. 33901 (May 25, 2023) ................................................................. 17

## GLOSSARY

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **BFE** | base flood elevation |
| **BiOp** | Biological Opinion |
| **CAC** | Community Assistance Contacts |
| **CAV** | Community Assistance Visits |
| **CLOMR** | Conditional Letter of Map Revision |
| **CLOMR-F** | Conditional Letter of Map Revision Based on Fill |
| **Corps** | U.S. Army Corps of Engineers |
| **CRS** | Community Rating System |
| **DLCD** | Oregon Department of Land Conservation and Development |
| **DRRA** | Disaster Recovery Reform Act of 2018 |
| **EIS** | Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **FIRMs** | Flood Insurance Rate Maps |
| **FIS** | Flood Insurance Study |
| **FEMA** | Federal Emergency Management Agency |
| **FRESH** | Flood Risk and Endangered Species Habitat |
| **FWS** | U.S. Fish and Wildlife Service |
| **LOMAs** | Letters of Map Amendments |
| **LOMCs** | Letters of Map Change |
| **LOMRs** | Letters of Map Revisions |
| **LOMR-F** | Letters of Map Revisions based on fill |

| | |
|---|---|
| **MMS** | Minerals Management Service |
| **NEPA** | National Environmental Policy Act |
| **NFIA** | National Flood Insurance Act of 1968 |
| **NFIP** | National Flood Insurance Program |
| **NMFS** | National Marine Fisheries Service |
| **PICMs** | pre-implementation compliance measures |
| **RBZ** | riparian buffer zone |
| **ROD** | Record of Decision |
| **RPA** | reasonable and prudent alternative |
| **SFHA** | special flood hazard area |
| **TRAC** | Telecommunications Research & Action Center |

## I.    INTRODUCTION

The Federal Emergency Management Agency ("FEMA") is working diligently to implement the National Flood Insurance Program ("NFIP") in Oregon in a manner consistent with all requirements of the Endangered Species Act ("ESA") and the recommendations of the National Marine Fisheries Service's ("NMFS") 2016 biological opinion ("2016 BiOp"). The 2016 BiOp recommended that FEMA undertake six reasonable and prudent alternative ("RPA") elements to avoid jeopardizing 16 ESA-listed anadromous fish species and Southern Resident killer whales. In response to the 2016 BiOp, FEMA developed a draft Oregon Implementation Plan for NFIP ESA Integration ("Integration Plan"). AR 0011469. FEMA fully implemented the requirements of RPA Element 1 by notifying the participating communities about the RPA as of June 13, 2016. As of July 15, 2024, FEMA also adopted interim, pre-implementation compliance measures ("PICMs") to address RPA Element 2, which includes interim measures recommended by NMFS to avoid jeopardy while FEMA completes further changes to the NFIP in Oregon in order to achieve full implementation of the Integration Plan. *See* AR 0018760 (letter to communities). Based in part on feedback from Oregon communities about potential substantial impacts to fully comply with the NMFS-recommended RPA elements, FEMA is currently preparing an Environmental Impact Statement ("EIS") to satisfy its obligations pursuant to the National Environmental Policy Act ("NEPA"). FEMA is working to complete the NEPA process and achieve full implementation of the Integration Plan by NFIP-participating communities[1] in Oregon to fully address the 2016 BiOp's recommended RPAs by September 1, 2027, in accordance with the deadline established by the Disaster Recovery Reform Act of 2018 ("DRRA"), Public Law Number 115-254, § 1246, 132 Stat. 3186, 3469 (Oct. 5, 2018).

---

[1] "'[C]ommunity' means a State or a political subdivision thereof which has zoning and building code jurisdiction over a particular area having special flood hazards." 42 U.S.C. § 4003(a)(1).

In light of the September 1, 2027 deadline established by the DRRA, Plaintiffs' claims concerning any alleged failure by FEMA to timely implement the RPAs are unripe. In any event, FEMA's diligent efforts to implement the RPA refute Plaintiffs' assertion that "FEMA has taken no meaningful actions to complete the work mandated in the BiOp or otherwise take alternative protective actions to avoid jeopardy and destruction or adverse modification of critical habitat." Complaint, ECF No. 1 ¶ 8. *See* also ECF No. 19 at 11 (asserting that FEMA's actions are "too little, too late"). Contrary to Plaintiffs' characterizations, FEMA is lawfully executing the NMFS-recommended RPA or implementing alternate measures to avoid jeopardizing listed species. FEMA's actions to date also refute Plaintiffs' assertion that FEMA has unlawfully delayed or unreasonably withheld taking action to ensure its compliance with ESA Section 7 via implementation of the NMFS-recommended RPAs or equivalent actions. Most importantly, FEMA's actions with respect to the PICMs (and other ongoing initiatives) demonstrate that FEMA is currently fulfilling its obligations pursuant to ESA Section 7, 16 U.S.C. § 1536(a)(2), to ensure that its implementation of the NFIP is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." The Court should therefore grant Defendants' cross-motion for summary judgment and deny Plaintiffs' motion.

## II.    STATUTORY BACKGROUND

### A.    <u>The National Flood Insurance Act and the National Flood Insurance Program</u>

Congress established the NFIP with the passage of the National Flood Insurance Act of 1968 ("NFIA"). 42 U.S.C. § 4001 *et seq*. The NFIP was further modified in 1973, and then again in 1994 with the passage of the Flood Disaster Protection Act and the National Flood Insurance Reform Act. *Id.*; Pub. L. No. 93-234, 87 Stat. 975 (1973); Pub. L. No. 103-325, Title 5, 108 Stat.

2255 (1994). Most recently, the NFIP was modified by the Biggert-Waters Flood Insurance Reform Act of 2012 ("Biggert-Waters Act"), Pub. L. No. 112-141, 126 Stat. 916 (2012), and the Homeowner Flood Insurance Affordability Act of 2014, Pub. L. No. 113-89, 128 Stat. 1020 (2014).

The NFIP is first and foremost a program for the provision of flood insurance. 42 U.S.C. § 4001(d). Congress found that "a program of flood insurance can promote the public interest by providing appropriate protection against the perils of flood losses and encouraging sound land use by minimizing exposure of property to flood losses. . . ." *Id.* To this end, the NFIP seeks to "encourage State and local governments to make appropriate land adjustments to constrict the development of land which is exposed to flood damage and minimize damage caused by flood losses." *Id.* § 4001(e). Congress mandated that FEMA "shall make flood insurance available" in communities that have evidenced interest in securing flood insurance through the NFIP and adopted floodplain management regulations consistent with criteria developed by FEMA. 42 U.S.C. §§ 4012(c), 4022(a); 44 C.F.R. § 60.1(a).

The NFIP was created as a Federal-State-Local partnership that depends on the states and local governments to regulate land use consistent with FEMA's minimum criteria. The power to regulate development in the floodplain, including requiring and approving permits, inspecting property, and citing violations, is granted to communities under a State's police powers. The Constitution reserves such police powers to the States, U.S. Const. Amend. X, and the States delegate this power to their respective political subdivisions. *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). To achieve the NFIP's public interest mandate to encourage sound land use by minimizing exposure of property to flood losses, the NFIP depends on participating states and their political subdivisions to promulgate and administer local floodplain management

ordinances pursuant to their role as the local land use authority. *Nat'l Wildlife Fed'n v. FEMA,* No. C11-2044-RSM, 2014 WL 5449859, at *11 (W.D. Wash. Oct. 24, 2014) (FEMA "is not a land-use authority and it can only provide guidance, technical assistance, require reporting, and institute enforcement actions. . . .").

### 1.    FEMA's Floodplain Management Criteria

The NFIA confers on FEMA general authority to encourage communities to adopt floodplain management criteria as a condition of their participation in the NFIP. 42 U.S.C. § 4012. Specifically, it requires FEMA:

> to develop comprehensive criteria designed to encourage, where necessary, the adoption of adequate State and local measures which, to the maximum extent feasible, will—
>
> > (1) constrict the development of land which is exposed to flood damage where appropriate,
> > (2) guide the development of proposed construction away from locations which are threatened by flood hazards,
> > (3) assist in reducing damage caused by floods, and
> > (4) otherwise improve the long-range land management and use of flood-prone areas... .

42 U.S.C. § 4102(c). FEMA's view of its general authority "is limited to developing criteria that are 'necessary' to accomplish the goal of protecting property and people from the consequences of flooding." AR 0000779 (citing 42 U.S.C. § 4102(c)).

In 1976, FEMA promulgated regulations setting forth the minimum floodplain management criteria required by the NFIA. *See* 42 U.S.C. § 4128; *see also*, 41 Fed. Reg. 46975 (Oct. 26, 1976). For a community to participate in the NFIP, it must adopt and enforce a floodplain management ordinance that meets or exceeds the regulatory criteria. *See* 44 C.F.R. §§ 59.2(b), 59.22(a)(3), 60.1. Communities incorporate these requirements into their zoning codes, subdivision ordinances, and/or building codes, or they adopt special purpose floodplain

management ordinances. These NFIP requirements apply to areas mapped as Special Flood Hazard Area ("SFHAs").[2] Participating NFIP communities are required to regulate all development in SFHAs. *See* 44 C.F.R. § 60.3(a). "Development" is defined as "any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials." *Id.* § 59.1. Before a property owner can undertake any development in the SFHA, a permit must be obtained from the community. The community is responsible for reviewing the proposed development to ensure that it complies with the community's floodplain management ordinance and that all necessary permits have been received from those governmental agencies from which approval is required by Federal or State law, such as Clean Water Act wetland permits from the U.S. Army Corps of Engineers ("Corps"). *Id.* § 60.3. Community ordinances must also include effective enforcement provisions. *Id.* § 59.2(b). A community that fails to adequately enforce its floodplain management ordinance may be put on probation or suspended from the NFIP. *See id.* § 59.24(b)-(c).

## 2.    Community Rating System

Congress also directed FEMA carry out a community rating system program to encourage communities to "voluntarily" adopt measures that reduce their flood risk. 42 U.S.C. 4022(b). In 1990, FEMA implemented the Community Rating System ("CRS") to recognize and encourage community floodplain management activities that exceed the minimum NFIP standards. *See*, *generally*, *id*. Any community in full compliance with the minimum NFIP floodplain management requirements may apply to join the CRS. *See id.* The CRS provides community-wide discounts on flood insurance premiums in communities that independently

---

[2] The SFHA is defined as "the land in the flood plain within a community subject to a 1 percent or greater chance of flooding in any given year. …" *See* 44 C.F.R. § 59.1.

choose to establish additional floodplain management regulations that exceed FEMA's minimum criteria. *Id.* § 4022(b)(1)(A). For a community that chooses to adopt more stringent land use measures, FEMA provides flood insurance premium discounts to policyholders in the community. 42 U.S.C. § 4022(b). FEMA establishes the CRS creditable activities and encourages communities to participate in the program, but any decision to participate is left to the sole judgment of a willing community. *Id.*

### 3.    FEMA's Floodplain Mapping Mandate

Under the NFIA, Congress directed FEMA to identify and publish maps of the SFHA and to establish flood-risk zone data. 42 U.S.C. § 4101. To assess flood hazards in a community, FEMA conducts Flood Insurance Studies ("FISs") and publishes FIS reports that describe the flood hazards for the community. *See generally* 44 C.F.R. § 59.1 (Definitions). FEMA uses the information developed in the FIS to prepare Flood Insurance Rate Maps ("FIRMs"). *Id.* The FIRM is the basis for the floodplain management, insurance, and mapping activities of the NFIP. *See generally* 44 C.F.R. Ch. 1 pt. 59. Maps depicting flood hazard information are utilized to promote broad-based awareness of flood hazards, provide data for rating flood insurance policies, and determine the appropriate minimum floodplain management criteria for flood-prone areas.

The NFIA requires that FEMA identify flood-prone areas and subdivide them into flood-risk zones to provide the data necessary for FEMA to determine the appropriate minimum floodplain management criteria and to rate flood insurance policies. 42 U.S.C. § 4101(a). While a variety of flood zones are mapped on FIRMs, the 100-year flood (or 1-%-annual-chance flood) is the standard used for implementation of the NFIP. *See* 44 C.F.R. § 59.1 (definition of "base flood"). The area subject to the 1-%-annual-chance flood is the SFHA. *See id.* (definition of

"area of special flood hazard). Any property located within the SFHA is subject to the minimum criteria discussed above. 44 C.F.R. § 60.3(c). FEMA publishes the FIRMs for distribution to a wide range of users:  private citizens, community officials, insurance agents and brokers, lending institutions, and other Federal agencies.

The NFIA requires FEMA to assess the need to revise and update FIRMs and flood-risk zones "based on an analysis of all natural hazards affecting flood risks." 42 U.S.C. § 4101(e)-(f). FEMA is required by statute to revise and update flood hazard maps (a) upon a determination that such revision or updates are necessary or (b) upon request from any State or community if accompanied by technical data sufficient to justify the requested change. *Id*. § 4101(f). Individual landowners may also request that a FIRM be revised by requesting a letter of map change. *See* 44 C.F.R. §§ 65.4-65.8; 44 C.F.R. pt. 72.

     4.     **Letters of Map Change**

To more accurately reflect the true flood-hazard risk on the ground, FEMA periodically revises FIRMs by either publishing a new FIRM or FIRM panels, or by making minor changes or corrections through Letters of Map Revisions ("LOMRs") or Letters of Map Amendments ("LOMAs"), collectively referred to as "Letters of Map Change ("LOMCs"). *See* 42 U.S.C. § 4101(f), (h); 44 C.F.R. pts. 70, 72. A LOMR is a modification of the effective FIRM "based on the implementation of physical measures that affect the hydrologic or hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway, the effective base flood elevation [("BFE")] or the SFHA." 44 C.F.R. § 72.2. A LOMR may also be issued as a result of updated flood-hazard data that requires a modification of the FIRM. *See* 44 C.F.R. §§ 65.4-65.6.

When a LOMR request for a project is submitted to FEMA, by definition, the physical modifications have already been constructed. FEMA assesses the effects of the completed project on the data contained in the effective FIRM and, if necessary, revises the FIRM through the issuance of the LOMR. The LOMR itself does not authorize, permit, fund, license, zone, or otherwise approve construction of any projects in the floodplain. FEMA may also issue a LOMR based on fill ("LOMR-F"), which "is a modification of the SFHA shown on the FIRM based on the placement of fill outside the existing regulatory floodway." 44 C.F.R. § 72.2. The LOMR-F documents the fact that the property is no longer subject to the 1% annual chance of flooding due to the risk reduction measures taken so the property is now outside the SFHA. When a LOMR-F is requested, the placement of earthen fill has already occurred. In that instance, FEMA determines whether the elevated area is above the BFE, warranting a revision of the effective FIRM. The LOMR-F itself does not authorize, permit, fund, license, zone, or otherwise approve any placement of fill in the floodplain.

A LOMA is an official determination by FEMA that a property has been inadvertently included in the SFHA or regulatory floodway, and the LOMA amends the FIRM to correct the error. 44 C.F.R. pt. 70. A property owner who believes his property has been inadvertently included in the floodplain may request a LOMA to establish the property's actual location in relation to the SFHA. *Id.* When FEMA issues a new FIRM, it automatically supersedes previously issued LOMCs for the covered area.

In sum, FEMA's responsibilities under the NFIP include: mapping flood hazards; enrolling communities in the NFIP; setting the minimum floodplain management criteria; providing programmatic monitoring and oversight; providing technical assistance to ensure that communities are complying with the NFIP program requirements; and enforcing the program

requirements when there are issues of programmatic non-compliance by a participating community.

**B.**    <u>**The Endangered Species Act**</u>

The ESA provides for the listing of species as "threatened" or "endangered," [3] if warranted, as well as for the designation of "critical habitat." 16 U.S.C. § 1533(a) The ESA provides various protections for listed species. As relevant here, ESA Section 7 requires that federal agencies ensure that any "agency action" authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ." *Id.* § 1536(a)(2).[4] ESA Section 7 and its implementing regulations set out detailed consultation procedures designed to provide action agencies with expert advice to determine the biological impacts of their proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. pt. 402. As an initial matter, the agency taking the action ("action agency") must determine whether its proposed action "may affect" an endangered or threatened species or its critical habitat. 50 C.F.R. § 402.14(a). Where the action agency determines that its proposed action has no effect on listed species or designated critical habitat, the consultation requirements are not triggered. *See id.*

If the action agency determines its action "may affect" a listed species or critical habitat,

---

[3] A "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered species" is one "which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

[4] The ESA defines "Secretary" to mean the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to the U.S. Fish and Wildlife Service ("FWS") and NMFS (collectively "the Services"), respectively. *Id.* § 1532(15). In general, FWS has authority over terrestrial species and NMFS has authority over marine species. *See, e.g., Nw. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060, 1065 n.5 (9th Cir. 1995). Plaintiffs in this action challenge FEMA's Section 7 compliance only as to consultation with NMFS.

it is required to consult with NMFS and/or FWS. 50 C.F.R. § 402.14(a). If the determination is

that the action may affect, but is not likely to adversely affect, listed species or critical habitat,

the action agency need not proceed with formal consultation if FWS and/or NMFS concur in that

determination. 50 C.F.R. § 402.13(c). If the action may affect, and is likely to adversely affect,

listed species or critical habitat, the action agency must request formal consultation. "Formal"

ESA consultation culminates in the issuance of a BiOp by NMFS or FWS, which advises the

action agency whether jeopardy is likely to occur for any listed species, whether critical habitat is

likely to be destroyed or adversely modified, and, if so, whether "reasonable and prudent

alternatives" exist to avoid a jeopardy or adverse modification situation. 50 C.F.R. § 402.14(h).

RPAs are defined as actions that are consistent with the intended purpose of the proposed

action, are within the action agency's legal authority and jurisdiction to implement, are

economically and technologically feasible, and will avoid jeopardy and/or adverse modification

of critical habitat. 50 C.F.R. § 402.02. *See also* 16 U.S.C. § 1536(b)(3)(A) ("If jeopardy or

adverse modification is found, the Secretary shall suggest those reasonable and prudent

alternatives which he believes would not violate subsection (a)(2) and can be taken by the

Federal agency or applicant in implementing the agency action."); *Sw. Ctr. for Biological

Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998) ("The Secretary need

only have adopted a final RPA which complied with the jeopardy standard and which could be

implemented by the agency."). Per the Services' implementing regulations, after completion of

formal consultation, the action agency must determine "whether and in what manner to proceed

with the action in light of its section 7 obligations and the Service's [BiOp]." 50 C.F.R. §

402.15(a). When a "jeopardy" opinion with an RPA is issued, the action agency must "notify the

Service of its final decision on the action." *Id.* § 402.15(b). The regulations do not provide any

deadline for the action agency's response. *Id.*

A BiOp and any recommended RPA contained therein serve an important "advisory function." 51 Fed. Reg. 19926, 19928 (June 3, 1986). If the action agency (here, FEMA) adopts the RPA recommended by the BiOp, its obligation under Section 7(a)(2) of the ESA is fulfilled. *Vill. of False Pass v. Watt*, 565 F. Supp. 1123 (D. Alaska 1983) (citing *North Slope Borough v. Andrus*, 642 F.2d 589, 610 (D.C. Cir. 1980)), *aff'd,* 733 F.2d 605 (9th Cir. 1984). As such, the Supreme Court has observed that a BiOp "has a powerful coercive effect on the action agency." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Despite the significant advisory role afforded NMFS in recommending measures to avoid jeopardy to threatened and endangered species through ESA consultation, the action agency in an ESA consultation process "has the primary responsibility for implementing section 7's substantive command." 51 Fed. Reg. at 19928. Accordingly, the ultimate decision whether to proceed with a proposed action following ESA consultation is committed to the discretion of the action agency. *See id.*; *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1194 (9th Cir. 1989) ("[W]e conclude that the steps taken by the Secretary to comply with ESA requirements were adequate, and his decision to reject some of NMFS's 'reasonable and prudent alternatives' was neither arbitrary nor capricious.").[5] In sum, an agency has several options in response to an RPA including modifying its proposed action to implement the RPA and developing alternative means of achieving the RPA's objectives. *Id.*[6]

---

[5] In *Tribal Village of Akutan,* NMFS recommended an RPA for the protection of gray whales as part of the Minerals Management Service's ("MMS") plan for oil and gas leasing in the North Aleutian Basin. 869 F.2d at 1193. The MMS did not fully adopt the NMFS-recommended RPA with respect to leasing deferrals within a specified geographic area and instead adopted alternative measures considered sufficient to prevent preliminary oil and gas exploration activities from endangering the whales. *Id.* The court concluded that the MMS fulfilled its responsibility "to insure that agency action . . . is not likely to jeopardize the continued existence of any endangered species." *Id.* at 1195 (quoting 16 U.S.C. § 1536(a)(2)).

[6] *See also National Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 (5th Cir. 1976) ("Section 7

The ESA also contains a provision authorizing citizen suits "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of [the Act] or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). This provision encompasses claims pursuant to Section 7 of the ESA, which creates a substantive duty for a federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize" the existence of the species or adversely modify its habitat. 16 U.S.C. § 1536(a)(2).

### III.    FACTUAL BACKGROUND

**A.    <u>The 2016 BiOp and RPA</u>**

On April 14, 2016, in response to ESA consultation initiated by FEMA pursuant to a settlement in *Audubon Society of Portland v. FEMA*, Case No. 3:09-cv-729-HA (D. Or.), NMFS issued a BiOp concerning the effects of FEMA's administration of the NFIP in Oregon. AR 0000001. In the BiOp, NMFS determined that FEMA's implementation of the NFIP jeopardizes listed salmonids because "the cumulative effects of such projects at the landscape scale may significantly degrade floodplain habitat functions, adversely affecting the survival and recovery of listed salmonids." AR 0000186. NMFS reasoned that there is an incentive for property owners to place sufficient fill to elevate their buildings above the base flood elevation to remove them from the jurisdiction of the NFIP's insurance requirements. AR 0000184. The placement of fill, in turn, is detrimental to floodplain and channel functions essential to the survival of juvenile salmonid species. AR 0000185. NMFS determined that the placement of fill and development of

---

does not give the Department of Interior a veto over the actions of other federal agencies, provided that the required consultation has occurred."); *Sierra Club v. Froehlke*, 534 F.2d 1289, 1303 (8th Cir. 1976) ("Should a difference of opinion arise as to a given project, the responsibility for decision after consultation is not vested in the Secretary but in the agency involved.") (citation omitted).

habitat in the floodplain is also detrimental to Southern Resident killer whales. AR 0000281

("The effects of the proposed action on Southern Resident killer whales are an increase in

exposure to persistent pollutants and a reduction in prey quality and quantity.").

With respect to the effects of FEMA's actions, NMFS reasoned that FEMA's

administration of the NFIP in Oregon "allows, incentivizes, and even offers technical guidance

for development, including fill, in floodplains, and that its restrictive elements largely are

building standards intended to minimize damage to structures." AR 0000276. Therefore, NMFS

determined that "the implementation of the NFIP in Oregon, as proposed, would directly and

indirectly affect anadromous species and their designated critical habitat, and that the effects

would be predominantly adverse." AR 0000149. Among other findings, the 2016 BiOp

concluded that FEMA's administration of the NFIP is likely to jeopardize the continued

existence of 16 ESA-listed anadromous fish species and Southern Resident killer whales. AR

0000282.

The 2016 BiOp included an RPA with six elements and individual sub-elements that

NMFS recommended FEMA undertake to avoid jeopardizing the 16 anadromous fish species

and killer whales. AR 0000284-85. On January 24, 2017, NMFS issued a clarification and errata

to the RPA. AR 0000411. As further described below, the RPA's six elements may be

summarized as follows:

1. Notice, education and outreach
2. Interim measures
3. Mapping flood and flood-related hazard areas
4. Floodplain management criteria
5. Data collection and reporting
6. Compliance and enforcement

*See* AR 0000287-307 (BiOp); 0018580 (Presentation on ESA Integration). NMFS reasoned that

all elements of the RPA, when adopted by FEMA, will promote wise use of the floodplain,

encourage appropriate land-use adjustments to constrict the development of land in flood-prone areas, guide the development of proposed future construction away from flood-hazard areas, require state and local communities as a condition of NFIP participation to adopt adequate floodplain ordinances with effective enforcement provisions consistent with Federal standards to reduce and avoid future flood losses, and accurately identify flood risks and provide flood risk information to the public. AR 0000316.

During the consultation process, FEMA reviewed drafts of the recommended RPA and raised FEMA's view that some elements of the RPA were not technically feasible to implement or were otherwise contrary to FEMA's legal authorities. *See, e.g.,* AR 0000778; AR 0000820; AR 0000903. NMFS disagreed and ultimately the agencies were not able to resolve these differences before the BiOp was issued. NMFS recognized that it would take 8.5 years (until September 2024) for FEMA to fully implement the RPA. AR 0000002; AR 0000325; AR 0000327.

**B.      Development of RPA Integration Plan**

In response to the 2016 BiOp, on May 4, 2016, FEMA's Assistant Administrator for Mitigation, Michael M. Grimm, sent a letter to NMFS's Assistant Regional Administrator, Kim Kratz, providing FEMA's preliminary response to the opinion and RPA. AR 0017919. In the letter, FEMA acknowledged receipt of the BiOp and stated that "FEMA is looking comprehensively at the NFIP to determine how to implement the RPA and the conservation recommendations, and to ensure continued compliance with the ESA." AR 0017920. Nevertheless, despite FEMA's concerns regarding certain aspects of the RPA, FEMA stated that, as a good steward of the environment, it will "take steps, consistent with the requirements of the RPA, to use its legal authorities under the National Flood Insurance Act for the benefit of ESA-

listed species and their habitat, as well as the floodplain functions that support such species and habitat." *Id.*

FEMA began working with its NFIP community partners, including NMFS, the Oregon Department of Land Conservation and Development ("DLCD"), tribal nations, and others, on interim and long-term implementation plans for the NFIP. AR 0001983 (August 10, 2016 letter to NMFS). FEMA sent notice letters to participating communities pursuant to this RPA on June 13, 2016. *See* AR 0001837. FEMA's notice letter included guidance on how to elevate structures by methods other than fill, as stipulated under RPA Element 1. *See id.* at 0001838. FEMA also began implementing pilot studies to address RPA Element 3. AR 0002122.

FEMA received extensive feedback from the State of Oregon, communities, Tribal Nations, and other stakeholders in response to the 2016 BiOp and RPAs. Many of these stakeholders expressed concerns about the burdens that would be imposed if communities were required to revise their existing floodplain ordinances to conform to the RPA elements. *See, e.g.*, AR 0003764. In part because of the need to complete a NEPA review of the recommended actions in the RPA, on February 1, 2018, FEMA notified NMFS of an anticipated one-year delay in implementing RPA Element 2. AR 0001019. The letter affirmed FEMA's commitment to implementing the RPA but noted that, "to the extent that we determine that a particular RPA is outside the scope of FEMA's authority to implement, or is economically and technically infeasible, we will explore and implement alternatives to accomplish the purpose of that RPA." AR 0001020.

On October 5, 2018, Congress passed the Disaster Recovery Reform Act of 2018, which included language extending all the deadlines in the 2016 BiOp 3 years. *See* Division D of Public Law 115-254, § 1246, 132 Stat. 3186, 3469, *available at* https://www.congress.gov/bill/115th-

congress/house-bill/302/text (last visited Sept. 18, 2024) ("The Administrator shall extend the deadlines to implement the reasonable and prudent alternative outlined in the jeopardy biological opinion dated April 14, 2016, by up to 3 years from the date of enactment of this Act."). With the extension of the deadline, and in light of the substantial objections raised by the State and others to the concept of implementing a set of interim requirements only to then change course and implement a new set of more permanent requirements, FEMA determined in December 2018 that it would not move forward with its impending implementation of the RPA Element 2 interim measures. AR 0017879-80 (Supporting Memorandum). Instead, FEMA determined that it would focus its efforts on developing, in coordination with NMFS, the State, and the Oregon communities, an implementation plan for the non-interim elements of the RPA. Declaration of John Graves ("Graves Decl.") ¶ 40, AR 0018678.

On February 6, 2019, FEMA sent a letter to the Oregon communities notifying them that, due to the three-year extension provided by the DRRA and the feedback that the communities strongly prefer "a single holistic plan rather than a series of steps that lead to overall compliance", FEMA would not be implementing interim measures pursuant to RPA Element 2. AR 0004018. In 2019, FEMA staff analyzed the RPA in depth to categorize RPA elements and sub-elements according to what FEMA believes it has authority to do and what is feasible, technically possible given limitations in technology/data/information, and will advance the objective of addressing adverse effects on species. Graves Decl. ¶ 42, AR 0018679. Where FEMA determined that RPA elements did not meet one or more of the criteria above, FEMA staff also identified possible alternative actions to meet the intent of the RPA. Graves Decl. ¶ 42, AR 0018679. These discussions informed FEMA's development of an initial Framework for RPA Implementation, which was finalized on November 1, 2019. *Id.* FEMA provided an

"Update to Congress on National Flood Insurance Program (NFIP) Implementation of the

National Marine Fisheries Service (NMFS) Biological Opinion Reasonable and Prudent

Alternative (RPA) in Oregon" on April 30, 2020. AR 0005057.

## C.    Draft Integration Plan and Scoping Process

On October 5, 2021, FEMA advised NMFS that it had completed its draft Oregon

Implementation Plan for NFIP ESA Integration and that its next step would be to make a

determination about the appropriate level of NEPA analysis required. AR 0001021 (letter to

NMFS); AR 0011469 (Draft Integration Plan). FEMA published a Notice of Intent to Prepare an

Environmental Impact Statement and, on March 6, 2023, gave notice that the public scoping

process had begun concerning the Draft Integration Plan. 88 Fed. Reg. 13841 (AR 0009207).

FEMA extended the comment period until June 26, 2023. 88 Fed. Reg. 33901 (May 25, 2023),

AR 0009211. Over the three-month public scoping period, FEMA held 12 public meetings,

reached over 800 people face-to-face, received 100 written submissions, and tabulated

approximately 1,000 distinct comments. AR 0011743 (Scoping Report).

On August 28, 2023, based on information developed during the scoping process, FEMA

concluded that a stand-alone EIS for the Draft Integration Plan is appropriate because: the action

will result in extensive change in land use or commitment of a large area of land; the

environmental impact is likely to be controversial; and the action is one of several actions

underway or planned for an area, and the cumulative impact of these actions is considered

significant. AR 0008994; AR 0008914-16 (Memorandum re: Validating NEPA review level ---

Post Public Scoping); AR 0011741 (Scoping Report). Current NEPA regulations at 40 C.F.R. §

1501.10(b)(2) require FEMA to prepare draft and final versions of the EIS, *id*. § 1502.9, publish

the draft and final versions of the EIS, *id*. § 1502.20, solicit comment on the draft EIS, *id*. §

1502.9, respond to comments submitted on the draft EIS, *id*. § 1503.4, and prepare the Record of Decision ("ROD"), *id*. § 1505.2. FEMA must allow at least a 45-day public comment period after publication of the draft EIS. *Id.* § 1506.10(d). The ROD cannot be signed until the latter of 90 days from the publication of a notice of availability of a draft EIS and 30 days after the publication of a notice of availability of a final EIS, *id*. § 1506.10. Publication of a Draft EIS is currently anticipated in early 2025. *See*

https://www.fema.gov/sites/default/files/documents/fema_r10_nfip-or-quarterly-update_062024.pdf (last visited Sept. 18, 2024). FEMA intends to continue to work towards implementation of the Integration Plan, subject to completion of the NEPA process, by September 2027. Graves Decl. ¶ 263, AR 0018725.

**D.    Pre-Implementation Compliance Measures**

Based on practical and technical considerations associated with its NEPA determination, on November 27, 2023, FEMA reconsidered its prior position and elected to begin implementation of interim ESA compliance measures for NFIP-participating communities in Oregon, in accordance with RPA Element 2. AR 0017876. Given the significant amount of time required to complete an EIS on the draft Integration Plan that is consistent with FEMA's requirements under NEPA, FEMA determined that it "must move forward with implementation of the interim RPA requirements in order to ensure that it also meets its obligations under the ESA." AR 0017880.

On July 15, 2024, FEMA publicly announced the PICMs that include outreach, education, and direct technical assistance to NFIP-participating communities in Oregon to ensure they demonstrate compliance with the ESA. *See* AR 0018608; AR 0018760 (letter to communities). The measures include a moratorium on all Letters of Map Change involving fill in

Oregon, which will remove a perceived incentive to filling in the floodplain. AR 0018611.

Consistent with the RPA Element 2's goal of using mitigation to achieve "no net loss" of aquatic

resources, *see* AR 0000289, NFIP communities will also be required to demonstrate actions have

been taken that result in no net loss of species and habitat as measured by effects of development

on flood storage, water quality, and riparian vegetation. *Id.* Specifically, NFIP-participating

communities in Oregon must select one of the PICM pathways, which include the following: (1)

adopting a model ordinance that considers impacts to species and their habitat and requires

mitigation to a no net loss standard; (2) choosing to require a habitat assessment and mitigation

plan for development on a permit-by-permit basis; or (3) putting in place a prohibition on

floodplain development in the SFHA. AR 0018760. Communities must elect a PICM pathway by

December 1, 2024. *Id.* If a community fails to inform FEMA of its selection, they will default to

the permit-by-permit PICM pathway. *Id.* Communities will be required to report their floodplain-

development activities to FEMA beginning in January of 2025. *Id.* Failure to report may result in

a compliance visit. *Id.; see also* 44 C.F.R. § 59.24(b)-(c)**.**

These measures, in addition to increased enforcement activities, will reduce the loss of floodplain

habitat features and functions. AR 0018611. Because the PICMs will meet the same goals identified in

RPA 2, FEMA anticipates that the PICMs will avoid jeopardy pending implementation of the other RPA

elements. *Id.*

###   E.    FEMA's Other Program Changes to the NFIP in Oregon

Although not taken in direct response to the issuance of the 2016 BiOp, FEMA has

undertaken several NFIP program changes at the national level that substantially reduce or

eliminate adverse effects that may be caused by the implementation of the NFIP in Oregon.

Graves Decl. ¶ 50, AR 0018680-81. These changes include: the implementation of the Risk

Rating 2.0 initiative[7]; the implementation of FEMA's ESA Section 7(a)(1) Conservation Action Program[8]; changes to flood hazard mapping to improve the accuracy of flood maps and the types of information included on flood maps[9]; and removal of a significant programmatic barrier to habitat restoration projects.[10] *Id.* FEMA anticipates that, "given the substantial program changes at the national level that will reduce or even eliminate any jeopardy caused by implementation of the NFIP in Oregon, the implementation of the interim RPA requirements by themselves will be sufficient to avoid jeopardy to ESA-listed species and habitat." AR 0017880 (footnote omitted).

## IV.    STANDARD OF REVIEW

Plaintiffs bring this action under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The ESA's citizen-suit provision authorizes a private party to sue any person "who is alleged to be in violation" of the ESA or its implementing regulations. 16 U.S.C. § 1540(g)(1). The APA affords review of final agency actions alleging failure to comply with the ESA. 5 U.S.C. § 706(2).[11] Such claims are

---

[7] Pursuant to the Risk Rating 2.0 initiative, NFIP premium rates will be commensurate with rates established by the private flood insurance industry. Graves Decl. ¶ 54, AR 0018682. These rate adjustments will alleviate the perception that the availability of affordable federal flood insurance incentivizes development in the floodplain that, in turn, jeopardizes species. *Id.* ¶ 56, AR 0018682.

[8] As part of the Conservation Action Program, FEMA has developed a Flood Risk and Endangered Species Habitat ("FRESH") web-based mapping tool. *Id.* ¶¶ 73-74, AR 0018685.

[9] For example, FEMA has amended the national requirements for Letter of Map Revision Based on Fill application packages to require communities to provide assurances that a development based on fill was determined to be ESA-compliant when fill was placed. Graves Decl. ¶ 101, AR 0018692. *See also* https://www.fema.gov/flood-maps/change-your-flood-zone/paper-application-forms/mt-1 (last visited Sept. 18, 2024). FEMA is also making a number of mapping changes to expand the data and information provided by the flood maps to better inform communities and property owners about flood risk including both regulatory and non-regulatory products. *Id.* ¶¶ 105-109, AR 0018694.

[10] As an incentive for communities to undertake habitat restoration projects that will benefit species, FEMA has waived fees for map change requests associated with these projects. Graves Decl. ¶¶ 79-82, AR 0018686-87.

[11] APA Section 704 establishes that only "final agency action" can form the basis of a court

reviewed under the standards of review provided in the APA, 5 U.S.C. § 706(2)(A). *See Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). The APA also allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). However, such a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004).

Although Plaintiffs acknowledge that "courts have adopted the APA standard of review when adjudicating ESA claims," ECF No. 19 at 9 n.1, Plaintiffs incorrectly suggest that the scope of review for ESA claims is not limited to the administrative record. *Id.* (citing *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011), and *Willamette Riverkeeper v. U.S. Army Corps of Eng'rs,* No. 6:17-cv-00801-MC, ECF No. 28 (D. Or. Feb. 28, 2018)). Contrary to Plaintiffs' arguments, the en banc Ninth Circuit has reaffirmed that APA record review applies in the ESA context.[12] *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d

---

challenge. 5 U.S.C. § 704 ("Agency action made reviewable by statute *and final agency action for which there is no other adequate remedy in a court* are subject to judicial review.") (emphasis added). "Final agency action" is the consummation of the agency's decision-making process from which "legal consequences will flow" or "rights or obligations have been determined." *Bennett*, 520 U.S. at 177-78.

[12] Accordingly, the Court should strike Plaintiffs' citations to extra-record documents, including ESA "five-year review" documents for various threatened and endangered species because they are outside the administrative record certified by FEMA and, in any event, pre-date many of FEMA's actions such as the PICMs that are subject to the Court's review in this case. *See* ECF No. 19 at 30-33 n.16-35. To the extent that the five-year review documents or Plaintiffs' other cited documents may be publicly available on U.S. government websites, the Court should not consider such materials for purposes of "judicial notice" as Plaintiffs urge. *See* ECF No. 19 at 9 n.1 (citing *People Not Politicians Or. v. Fagan*, No. 6:20-cv-01053-MC, 2021 WL 2386118, at *2 (D. Or. June 10, 2021)). Plaintiffs' apparent suggestion that any and all information gleaned from a government website may appropriately be the subject of judicial notice would create an exception so large as to swallow the rule that APA review is based on an agency's administrative record.

1006, 1017 (9th Cir. 2012) (en banc) ("An agency's compliance with the ESA is reviewed under the [APA]" and the Court must adjudicate the merits of the claim "based upon our review of the administrative record") (citations omitted). The Ninth Circuit has since followed this en banc authority, as it must. *Jewell*, 747 F.3d at 601-02 (ESA claims are reviewed under the standards of the APA, including the requirement that "review is limited to 'the administrative record already in existence, not some new record made initially in the reviewing court.'") (citation omitted).

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## V.    ARGUMENT

The issue before the Court is whether FEMA's implementation of the NFIP in Oregon is presently likely to jeopardize species or result in the destruction or adverse modification of critical habitat. FEMA has explained its actions to date to implement the elements of the NMFS-recommended RPAs, or alternative, reasonably adequate measures, in the Declaration of John Graves, Chief, Mitigation Division of Region 10 Floodplain Management and Insurance Branch, FEMA. AR 0018670.

Plaintiffs' ESA claims depend on a finding that FEMA is not implementing the terms of the RPA as set forth in the in the 2016 BiOp. *See* ECF No. 19 at 36. However, departure from the terms of an RPA is not, in itself, a violation of the ESA, so long as the agency action in question is not actually jeopardizing the continued existence of listed species or adversely modifying their critical habitat. *See Tribal Vill. of Akutan,* 869 F.2d at 1193.

As explained below, FEMA is presently avoiding jeopardy and adverse modification by

implementing the PICMs in satisfaction of RPA Element 2. Where FEMA has opted to follow an alternative pathway forward to avoid jeopardy and adverse modification, FEMA has explained the basis of its decision.

Before turning to the merits of Plaintiffs' claims, we address two threshold issues. First, the ESA-based claims set forth in Plaintiffs' First Claim for Relief are unripe to the extent Plaintiffs prematurely assert that FEMA has failed to achieve "full implementation" of the NMFS-recommended RPA ahead of the September 1, 2027 deadline established pursuant to the DRRA. To the extent Plaintiffs' claims are reviewable at all, the Court's review should be focused on the merits of the PICMs announced July 15, 2024, because the PICMs constitute a reviewable, final agency action based on the reasoning in *Bennett,* 520 U.S. at 177-78. Second, the APA-based claims presented in Plaintiffs' Second Claim for Relief are legally unavailable because they duplicate the ESA-based Claims set forth in their First Claim for Relief. In the alternative, if the Court finds that any of FEMA's actions or alleged inactions are subject to review pursuant to Plaintiffs' Second Claim for Relief, the record before the Court confirms that FEMA has neither unlawfully delayed nor unreasonably withheld action to implement the NMFS-recommended RPAs.

**A.    Plaintiffs' Claims Concerning "Full Implementation" of the NMFS-Recommended RPA Are Unripe.**

FEMA has until 2027 to achieve full implementation of the BiOp. The 2016 BiOp stipulated that, "[b]y September 1, 2024, FEMA must demonstrate that all NFIP participating jurisdictions in Oregon subject to this consultation have adopted and implemented all requirements from Elements 3 and 4 of this RPA." AR 0000306. *See also id.* ("In order to meet the requirements of this RPA, by September 1, 2024, FEMA will demonstrate full program compliance by those communities subject to this RPA. . . ."). As explained above, the DRRA

included language extending all the deadlines in the 2016 BiOp by three years. *See* DRRA

Section 1246, *supra.* Accordingly, FEMA has until Septembert 1, 2027, to achieve full

implementation of the Draft Integration Plan, which the agency is diligently working to achieve.

Plaintiffs' First Claim with respect to FEMA's alleged "failure to complete its implementation of

the RPA," s*ee* ECF No. 1 ¶ 103, is unripe and will not ripen until September 1, 2027, by which

time FEMA anticipates that it will have completed the EIS process and implemented the RPA.

Graves Decl. ¶ 263, AR 0018725 ("FEMA intends to continue to work towards implementation

of alternative, reasonably adequate steps to insure the continued existence of any endangered or

threatened species, subject to completion of the NEPA process, by September 2027."). *See also*

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967) ("The ripeness requirement "prevent[s]

the courts, through avoidance of premature adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a concrete

way by the challenging parties.").

> Application of the ripeness doctrine requires consideration of three factors:
>
> (1) whether delayed review would cause hardship to the plaintiffs; (2) whether
> judicial intervention would inappropriately interfere with further administrative
> action; and (3) whether the courts would benefit from further factual development
> of the issues presented.

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (holding that facial challenge to a

Forest Service plan, as opposed to a specific project implementing a plan, was not ripe for

adjudication). Applying these factors here demonstrates that Plaintiffs' claims concerning "full

implementation" of the RPAs are unripe. As to the first factor, under the Supreme Court's

decision in *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967), the hardship test is satisfied

only if the challenged administrative action would have an immediate effect on the primary

conduct of the petitioner. *Nat. Res. Def. Council v. EPA*, 859 F.2d 156, 166 (1988) (per curiam). Deferring judicial review does not have any immediate effect on Plaintiffs in this case, because Plaintiffs' alleged ESA-related injuries involve the indirect and cumulative effects of actions by third parties. As to the second factor, judicial intervention may interfere with FEMA's ongoing actions (explained in detail in the Graves Declaration, AR 0018670) to finalize the Integration Plan as to RPA Elements 3-6, subject to completion of NEPA review. As to the third factor, this is clearly a situation in which the Court would benefit from deferring consideration of Plaintiffs' challenge until further factual development of the issues is presented: FEMA only recently announced the PICMs on July 15, 2024. *See* AR 0018760. Understandably, the Oregon communities are in the earliest stages of implementation of the PICMs. Under the circumstances, further factual development would "significantly advance [the Court's] ability to deal with the legal issues presented." *See Nat'l Parks Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (citations omitted). Applying these same factors, the U.S. District Court for the District of Columbia dismissed as unripe a previous challenge concerning FEMA's actions pursuant to the 2016 BiOp. *Oregonians for Floodplain Prot. v. U.S. Dep't of Com.*, 334 F. Supp. 3d 66, 74 (D.D.C. 2018). This Court should follow that example based on these same ripeness factors.

Plaintiffs incorrectly suggest that FEMA's compliance with specific RPA elements should be measured against earlier implementations deadlines, such as the March 15, 2018 deadline incorporated in the NMFS-recommended RPA Element 2, notwithstanding the extension of the deadline for full RPA implementation pursuant to the DRRA. *See* ECF No. 19 at 38 n.39. Moreover, while FEMA disagrees that the original, interim deadlines in the RPA remain applicable in light of the DRRA, it is unnecessary for the Court to reach this issue. FEMA has shown–as explained in detail in argument Section C below–that the PICMs *currently being*

*implemented* avoid jeopardy to species, because they meet the same "no net loss" goals identified in RPA Element 2, AR 0000289 n.148. AR 0018611. *See also* Graves Decl. ¶ 49, AR 0018680 ("[G]iven the substantial program changes at the national level, the implementation of the interim RPA requirements by themselves will be sufficient to avoid jeopardy to ESA-listed species and habitat.").

**B.**     **The Court lacks subject-matter jurisdiction over Plaintiffs' duplicative APA claim concerning alleged unreasonable delay.**

As another threshold matter, the Court lacks subject-matter jurisdiction over the Second Claim for Relief because the ESA expressly provides an adequate remedy for Plaintiffs' claims that FEMA failed to comply with the requirements of ESA Section 7. Plaintiffs' Second Claim for Relief asserts that FEMA's alleged failure to implement the NMFS-recommended RPA, or other reasonably adequate protective measures, constitutes an agency action "unlawfully withheld or unreasonably delayed" pursuant to the APA, 5 U.S.C. § 706(1). ECF No. 1 ¶ 112. The APA does not afford Plaintiffs a cause of action where, as here, another statute affords review of the same agency action and the Plaintiffs have pled a claim under the other statute.

The APA authorizes judicial review of claims concerning "[a]gency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court*. . . ." 5 U.S.C. § 704 (emphasis added). As described in *Bennett*, 520 U.S. at 171, the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(1), authorizes injunctive actions against any person "who is alleged to be in violation" of the ESA or its implementing regulations.[13] It is

---

[13] *Bennett* also recognized that an APA-based cause of action could be maintained where the citizen-suit provision does not allow judicial review of certain actions by the Secretary of the Interior to implement the ESA. 520 U.S. at 163. However, such an APA-based cause of action is not available here, because Plaintiffs are challenging the actions of FEMA, not the Secretary of the Interior. Congress instead authorized an adequate remedy for any of Plaintiffs' ESA-related claims in this case. Indeed, Plaintiffs' Complaint already includes an express claim (Plaintiffs' First Claim for Relief) that FEMA violated the ESA. ECF No. 1 ¶¶ 98-105.

well settled that where, as here, plaintiffs have available claims alleging ESA violations pursuant

to the ESA's citizen-suit provision, plaintiffs are precluded from restyling those ESA claims as

duplicative APA claims. *American Canoe Ass'n v. EPA*, 30 F.Supp.2d 908, 927 (E.D. Va. 1998)

("[T]he APA does not provide an avenue for duplicative review when a statute specifically sets

out procedures for review of agency action, and so [APA-based claims alleging ESA violation]

must be dismissed."); *McCrary v. Gutierrez*, 528 F. Supp. 2d 995, 999 (N.D. Cal. 2007) ("Since

the ESA allows Plaintiff to file a citizen suit, the APA cannot provide jurisdiction for Plaintiff's

action."); *Haw. Cnty. Green Party v. Clinton*, 124 F. Supp. 2d 1173, 1193 (D. Haw. 2000) ("The

Court concludes that a particular claim may only be brought under either the APA or the ESA—a

plaintiff may not cho[o]se her statutory weapon.").[14] In sum, the ESA claims asserted by

Plaintiffs are subject to the ESA's citizen-suit provision, and there is no alternate avenue for

Plaintiffs to challenge FEMA's actions or alleged actions pursuant to the APA.

Even if an APA cause of action were not precluded by the availability of an ESA citizen-

suit claim, Section 706(1) of the APA is wholly inapplicable. The Supreme Court has recognized

that an agency's "failure to act" is sometimes, but not always, remediable under the APA. *See*

*SUWA*, 542 U.S. at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that

an agency failed to take a discrete agency action that it is required to take."). Here, Plaintiffs fail

to state a claim pursuant to 5 U.S.C. § 706(1) because they fail to identify any discrete agency

action that FEMA is required to take. As explained in detail above, an action agency's response

to a BiOp and RPA is discretionary. As explained in *Bennett,* "[t]he action agency is technically

---

[14] *See also, Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (where Congress provides special
procedure for review of agency action, duplicative review under APA not available); *Allegheny
Cnty. Sanitary Auth. v. EPA*, 732 F.2d 1167, 1176-77 (3d Cir. 1984) (where CWA citizen-suit
remedy available, review under APA precluded); *Env't Def. Fund v. Tidwell*, 837 F. Supp. 1344,
1355 (E.D. N.C. 1992) (same).

free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril. . . ." *Bennett,* 520 U.S. at 170. An agency may be sued for an alleged violation of ESA Section 7(a)(2) pursuant to the ESA's citizen-suit provision, as Plaintiffs have asserted in their First Claim for Relief. *See id.* But FEMA's alleged failure to implement an RPA in the specific manner preferred by Plaintiffs does not give rise to an APA claim pursuant to 5 U.S.C. § 706(1). *See Defs. of Wildlife v. U.S. Fish and Wildlife Serv.*, 797 F. Supp. 2d 949, 963 (D. Ariz. 2011) ("The administrative record in this case reflects that this is not a case like [*Pyramid Lake Paiute Tribe of Indians v. United States,* 898 F.2d 1410 (9th Cir. 1990)] where the agency has taken no action whatsoever, and a reviewing court should have no problem in finding total inaction and issuing an order to 'compel agency action unlawfully withheld or unreasonably delayed.'").The Court should grant summary judgment in favor of Federal Defendants with respect to Plaintiffs' Second Claim for Relief because, as explained in detail above, there is no specific, discrete agency action that FEMA is required to take in response to a NMFS-recommended RPA.

Again, the September 2027 deadline for full implementation of the RPA has not elapsed. To the extent Plaintiffs' ESA-related claims are reviewable at all, they must be reviewed pursuant to the APA, 5 U.S.C. § 706(1), in relation to the specific, final actions that FEMA has taken to date with respect to RPA Elements 1 and 2 pending completion of the NEPA process and finalization of the Draft Integration Plan. FEMA has reasonably concluded that the PICMs avoid jeopardy to ESA-listed species, for the reasons explained in detail below.

C.     **FEMA's RPA Pre-Implementation Compliance Measures Ensure Against Jeopardy and Destruction or Adverse Modification of Habitat Under ESA Section 7 (First Claim for Relief).**

Turning to the merits of Plaintiffs' ESA-based claims asserted in their First Claim for Relief, the issue before the Court is whether FEMA's implementation of the NFIP in Oregon is

presently likely to jeopardize species or result in the destruction or adverse modification of critical habitat.

FEMA has explained its actions to date to implement the elements of the NMFS-recommended RPAs, or alternative, reasonably adequate measures, in the Declaration of John Graves. AR 0018670. In short, FEMA implemented the requirements of RPA Element 1 as of June 13, 2016. As of July 15, 2024, FEMA adopted the PICMs to address RPA Element 2. *See* AR 0018760 (letter to communities). As to the remaining RPA elements, FEMA has developed a Draft Integration Plan and is working to achieve full implementation by NFIP-participating communities by September 1, 2027.[15] The affirmative actions taken by FEMA to implement the RPA elements are discussed in further detail below.

1. **RPA Element 1**

FEMA fully implemented the requirements of RPA Element 1 as of June 13, 2016. RPA Element 1 recommended that FEMA develop an education and outreach strategy for RPA implementation and provide notice to all NFIP-participating communities in Oregon regarding the outcome of the agency's consultation and the substance of the RPA. AR 0000287. Pursuant to this recommendation FEMA prepared detailed notice letters which included guidance on how to elevate structures by methods other than fill. These letters were then circulated in participating communities on June 13, 2016. *See* AR 0001837. Accordingly, notwithstanding Plaintiffs' failure to credit or mention FEMA's timely implementation of RPA Element 1, it is irrefutable that FEMA has satisfied this element in full. *See* Graves Decl. ¶ 144, AR 0018703.

---

[15] We note that FEMA's Draft Integration Plan is not itself a final agency action subject to APA review. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 483 (2004) ("[T]o be final, agency action must mark the consummation of the agency's decisionmaking process, and must either determine rights or obligations or occasion legal consequences.") (cleaned up). However, we refer to the Draft Integration Plan to the extent that it informs the PICMs that FEMA is presently undertaking.

2.      **RPA Element 2 and the PICMs**

RPA Element 2 consists of interim measures to ensure that existing natural floodplain functions are maintained pending full RPA implementation. AR 0000288. FEMA is actively working to implement the terms of RPA Element 2 through the PICMs. The PICMs include a suspension of CLOMR processing and procedures to ensure no net loss of floodplain functions. *See* AR 0018608; AR 0018760. The PICMs avoid jeopardy to species and destruction or adverse modification of critical habitat in satisfaction of FEMA's duties pursuant to ESA Section 7(a)(2) pending full implementation of the Integration plan. Where the PICMs differ from RPA elements as recommend in the 2016 BiOp, FEMA has reasonably elected to contour its compliance efforts within the confines of the directives under the ESA and its authorities under the NFIA.

As an example, the 2016 BiOp recommended that FEMA impose specific limitations on the types of development in the riparian buffer zone ("RBZ") and require specific types of mitigation. AR 0000289. Based in part on concerns raised by some Oregon communities, FEMA has offered an alternative that allows local communities to choose from three alternatives to ensure that their permitting actions do not result in ESA violations. AR 0018760. This approach reflects FEMA's careful consideration of the ESA's directive to conserve listed species and input from Oregon floodplain communities. To the extent that Plaintiffs assert that the procedures contemplated in the PICMs differ from specific provisions in the NMFS-recommended RPA Element 2 with respect to the timing or substance of the actions required of communities, it is well settled that, after receiving a recommended RPA from NMFS or FWS, an action agency may lawfully elect to satisfy the requirements of Section 7 by taking "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species." *Tribal Vill. of Akutan*, 869 F.2d at 1193; *see also Jewell,* 747 F.3d at 643 ("Our cases confirm that an action agency . . . has some discretion to deviate from the BiOp and its RPAs."); *Vill. of False Pass*, 565 F. Supp.

2d at 1154 ("the decision whether or not to proceed with the project rests ultimately with the Secretary. He must insure that agency actions are not likely to jeopardize the continued existence of the species") (citations omitted). We address the sub-elements of RPA Element 2 below.

a.    **RPA Elements 2A-2B**

RPA Elements 2A-2B recommended interim measures to reduce the loss of floodplain habitat features and functions while the long-term measures laid out in Elements 3-6 of the RPA are phased in. AR 0000288. FEMA is ensuring that the objectives of RPA Elements 2A-2B are satisfied through application of the PICMs during the pendency of FEMA's ongoing efforts to complete the NEPA process and finalize its Draft Integration Plan, AR 0017877 (Decision Memorandum dated November 27, 2023); Graves Decl. ¶ 145, AR 0018703. FEMA's actions fulfill these recommendations by providing three alternatives for communities to ensure that their permitting actions do not result in ESA violations. FEMA has notified communities that they must: (a) prohibit all development in the SFHA until full implementation of the Integration Plan; (b) adopt the NFIP/ESA Model Ordinance for Oregon; or (c) ensure protection of floodplain functions on a permit-by-permit basis.[16] AR 0018760. To ensure that existing natural floodplain

---

[16] Plaintiffs note (ECF No. 19 at 22 (citing AR 0000212)) that the 2016 BiOp questioned whether a permit-by-permit assessment would be likely to capture cumulative effects of development resulting from individual permits. *See* AR 0000397 ("A parcel-by-parcel approach (Door 3) raises the challenge of addressing cumulative effects adequately."). FEMA also acknowledges NMFS's opinion that the 2016 BiOp "encourages FEMA to promote the use of the large-scale approaches," *id.*, but this did not preclude FEMA from incorporating permit-by-permit assessment among compliance options provided to the communities. *See id.* Moreover, providing communities with alternatives to ensure that their permitting actions do not result in ESA violations is consistent with the NFIA, which requires FEMA "to develop comprehensive criteria designed to *encourage,* where *necessary,* the adoption of adequate State and local measures . . . ." 42 U.S.C. § 4102(c) (emphasis added). Under the circumstances, FEMA reasonably decided to include permit-by-permit assessment among its three options for communities to elect pursuant to the PICMs that incorporate guidance to communities (i.e., the Model Ordinance and the Oregon habitat assessment guide) that effectuate NMFS's own recommended mitigation ratios.

functions are maintained pending full RPA implementation, as contemplated in the NMFS-recommended RPA, the model ordinance and guidance to communities regarding protection of floodplain functions on a permit-by-permit basis pursuant to the PICMs both employ the mitigation ratios recommended by NMFS in the RPA. *Compare* AR 0000289 and AR 0018657-59 (model ordinance Section 6.1) (updated version available at

https://www.fema.gov/sites/default/files/documents/fema_r10_oregon-nfip-esa-model-ordinance_082024.pdf (last visited Sept. 18, 2024)) and AR 0018807 (2024 draft Oregon habitat assessment guide Section 2.5.3) (final version available at

https://www.fema.gov/sites/default/files/documents/fema_r10_oregon-habitat-assessment-guide_082024.pdf (last visited Sept. 18, 2024)). The three options FEMA provided for communities to ensure that their permitting actions do not result in ESA violations are alternative, reasonably adequate steps for the communities to achieve the "no net loss" goal set forth in NMFS's recommended RPA Element 2, AR 0000289 n.148. *Tribal Vill. of Akutan*, 869 F.2d at 1193.

### b.    RPA Elements 2C-2D

FEMA is fully complying with the requirements of RPA Elements 2C-2D by suspending approvals of LOMR-Fs and Conditional Letters of Map Revision Based on Fill ("CLOMR-Fs") in counties where designated critical habitat for ESA-listed anadromous fish exist pending the implementation of permanent ESA compliance measures. Graves Decl. ¶¶ 150, 155, AR 0018704-05; AR 0005571 (Guidance Document 48); AR 0018667 (LOMC-F delay in processing memo). RPA Element 2C recommended that FEMA cease processing certain Letters of Map Revision Based on Fill that fail to demonstrate to FEMA that all impacts to development to natural floodplain functions were avoided or mitigated. AR 0000290. The RPA recommendation

further provided that, in the alternative, the applicant may demonstrate to FEMA that the ESA was otherwise satisfied separately via ESA Section 7, 10, or 4(d). *Id.* In addition to 2C, RPA Element 2D recommended that FEMA review all requests for Conditional Letters of Map Revision (CLOMR) and CLOMR-F to determine whether the proposed projects will adversely affect floodplain functions and, if so, prescribe mitigation measures for those projects. *Id*. FEMA's suspension plainly meets the purpose and requirements of Elements 2C-2D given that no CLOMR and CLOMR-Fs will be processed or approved that would impact natural floodplain functions.

### c.    **RPA Element 2E**

RPA Element 2E requires FEMA to track all permitted development - which occurs without FEMA's knowledge and under the regulatory oversight of states and local communities - and also track all mitigation activities associated with this development. AR 0000290; Graves Decl. ¶ 156, AR 0018705. FEMA is providing a reporting tool for communities to collect data on floodplain development activities. Graves Decl. ¶¶ 156, 209, AR 0018705 & 0018711. "Communities will be required to report their floodplain development activities to FEMA beginning in January of 2025." AR 0018760. This action satisfies RPA Element 2E.

### d.    **RPA Element 2F**

Interim RPA Element 2F calls for FEMA to recommend to the State that when multiple repeat-damage buyout opportunities exist, the State prioritize development buyouts based on presence of high-quality salmonid populations. AR 0000290; Graves Decl. ¶¶ 158-159, AR 0018706. FEMA has provided its recommendation that the State of Oregon prioritize development buyouts based on presence of high-quality salmonid populations by letter to Oregon Department of Emergency Management dated May 31, 2024. AR 0018665. This action fully

satisfies the recommendations contained in RPA Element 2F. AR 0000290; Graves Decl. ¶¶ 158-159, AR 0018706.

In sum, pending completion of the EIS process and finalization of the Draft Integration Plan, FEMA is implementing the PICMs in a manner that satisfies the intent of RPA Element 2, even if it deviates from the exact technical specifications of the BiOp in some respects. *See* Graves Decl. ¶ 261, AR 00018724. Again, FEMA is complying with RPA Element 2 via the pre-implementation compliance measures including: the moratorium on all Letters of Map Change involving fill in Oregon (Interim Measure 1) and notification to communities that they must: (a) prohibit all development in the SFHA until full implementation of the Integration Plan; (b) adopt the NFIP/ESA Model Ordinance for Oregon; or (c) ensure protection of floodplain functions on a permit-by-permit basis (collectively, Interim Measure 2). AR 0017877. FEMA is also requiring communities to report on the implementation of these measures beginning in December 2024.[17] AR 0018835. FEMA will assist communities in implementing these measures via in-person trainings and workshops and Community Assistance Contacts. *Id.* Although the PICMs integrate deviations from specific recommendations in the 2016 BiOp, FEMA has articulated its reasons for adjusting its RPA implementation judiciously. *Bennett*, 520 U.S. at 169. By implementing the PICMs, FEMA has taken alternative, reasonably adequate steps consistent with NMFS's

---

[17] Plaintiffs correctly observe that the record of FEMA's implementation of the PICMs to date includes some documents in draft form, including the Model Ordinance. *See* ECF No. 19 at 39. Putting aside the fact that the Model Ordinance is not itself a final agency action subject to review, there is no basis for Plaintiffs to infer that, "[g]iven FEMA's prior track record of delay, there is little reason to believe FEMA will adhere to the dates set out in its Draft Integration Plan and the Graves Declaration." *Id.* at 40. Contrary to Plaintiffs' assertion that FEMA will not carry out the PICMs in a timely fashion as described in the Graves Declaration and the record before the Court, there is a strong presumption of regularity in reviewing administrative actions, including actions of FEMA. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ("Certainly, the Secretary's decision is entitled to a presumption of regularity."); *Daly v. Volpe*, 514 F.2d 1106, 1111 (9th Cir. 1975) ("There is no showing that the administrative action was irregular and taken in bad faith. We will assume therefore that the EIS is not a sham.").

recommended RPA Element 2 to insure that it does not violate the ESA. *Tribal Vill. of Akutan*, 869 F.2d at 1193. Thus, in contrast to the facts in *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,* 479 F. Supp. 3d 1003 (D. Or. 2020), cited by Plaintiffs at ECF No. 19 at 48-49, FEMA has shown that that its current actions pursuant to the PICMs ensure that FEMA's implementation of the NFIP in Oregon does not cause jeopardy to ESA-listed species or adverse modification of their habitat within the Action Area covered by the Oregon BiOp.[18]

### e.    RPA Element 3

RPA Element 3 recommended that FEMA implement specific program standards to identify and map flood-hazard areas and flood-related erosion hazard areas. AR 0000291. For example, the RPA contemplates that FEMA will undertake new modeling analyses to assess flood hazard areas. AR 0000292; Graves Decl. ¶¶ 186-191, AR 0018706-07. The 2016 BiOp acknowledged that "full program compliance" with RPA Element 3 would take a period of some 8.5 years until September 1, 2024. AR 00000306. The deadline for full compliance has been extended until September 1, 2027. As noted above, this deadline has not lapsed yet. However, FEMA has made substantial efforts to begin complying with RPA Element 3, as explained in the Declaration of John Graves.

Because of the complexity involved in FEMA's mapping processes and differences of opinion about the feasibility of specific measures in the RPA, *see* Graves Decl. ¶ 192, AR 0018707, "FEMA felt that extra study and analysis was necessary to ensure that the approaches

---

[18] *Sw. Ctr. for Biological Diversity v. Babbitt*, No. CIV. 97-0474 PHX-DAE, 2000 WL 33907602 (D. Ariz. Sept. 26, 2000), cited by Plaintiffs at ECF No. 19 at 49, is also distinguishable. In that case, the court reviewed the sufficiency of amendments to RPAs issued by FWS, which was the consulting agency in that case. The court concluded that FWS had not adequately justified its own decision to modify the RPAs. *Id.* at *11. Here, by contrast, FEMA has explained the basis of its decision to implement alternatives to the NMFS-recommended RPAs in accordance with *Tribal Village of Akutan*, *supra.*

set out in the RPA would actually result in better, more accurate flood maps, which is the stated objective of the RPA." *Id.*

Therefore, FEMA undertook a series of pilot studies prior to integrating the RPA Element 3 mapping recommendations into FEMA's program. *Id.* ¶ 193, AR 0018707. The first pilot was completed in September 2020 by the U.S. Army Corps of Engineers. *Id.* ¶ 195, AR 18708. The second pilot was completed by FEMA Region 10's mapping contractor in December 2022. *Id.* For those RPA sub-elements that FEMA determined to be generally appropriate for implementation (RPA sub-elements 3Aiii, 3D, and 3F (to the extent levee data is available from the U.S. Army Corps of Engineers))[19], as explicated in the Graves Declaration, FEMA is undertaking further pilot studies to determine the best way to implement them. *Id.* ¶ 197, AR 0018708-09. In addition, FEMA is undertaking national-level initiatives to improve the accuracy of flood maps and expand the scope of information provided by flood maps to include the residual risk behind levees, future conditions flood risk, and other inclusions required by law. *Id.* ¶¶ 102-127, AR 0018693-98. These actions satisfy those sub-elements of RPA Element 3, for which FEMA reasonably determined that it has authority to implement. *See id.* ¶ 197, AR 0018708-09. Where, as here, an agency's technical expertise is involved, "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). As FEMA prepares communities for full implementation of the RPA pending completion of the NEPA process and finalization of the Draft Integration Plan, agency staff will offer technical assistance and outreach to communities to ensure they understand the

---

[19] Through these pilot studies, FEMA found that many of the sub-elements of RPA Element 3 should not be implemented for a variety of reasons. *Id.* ¶ 196, AR 0018708. Some should not be implemented because they do not adhere to technically sound engineering practices. *Id.* Some should not be implemented because they only work in certain areas. *Id.* Others should not be implemented because sufficient data and information does not exist to implement them properly. *Id.*

products of the pilot study and how these tools can support their local efforts to integrate multi-benefit mapping data into their hazard mitigation and conservation planning to ensure ESA compliance. Graves Decl. ¶ 201, AR 0018709-10.

      **f.    <u>RPA Element 4</u>**

RPA Element 4 recommended FEMA undertake revisions to its regulatory floodplain management criteria to avoid, minimize, and mitigate the adverse effects of floodplain development on remaining habitat functions and processes. AR 0000296. Among other recommendations, the RPA recommended FEMA revise its regulations at 44 C.F.R. pt. 60 to incorporate an ESA performance standard into the regulatory floodplain management criteria required as a condition of NFIP eligibility in Oregon. AR 0000298. As with RPA Element 3, the 2016 BiOp acknowledged that "full program compliance" with RPA Element 4 would take a period of some 8.5 years until September 1, 2024. AR 00000306. Again, the deadline for full compliance has been extended until September 1, 2027, so this deadline has not lapsed yet. However, FEMA's Draft Integration Plan will fully address RPA Element 4.

Section III of the Oregon Plan for NFIP ESA Integration outlines FEMA's proposed alternative approach to meeting the intent of RPA Element 4 by providing guidance to communities on multiple routes to achieving a "no net loss" of three key natural floodplain functions (flood storage, water quality, and riparian habitat) for new development actions within the SFHA. Graves Decl. ¶ 203, AR 0018710. *See also* AR 0000297. As explained in FEMA's Draft Integration Plan, the four paths for Oregon NFIP Communities to demonstrate consistency with the Oregon BiOp are as follows:

     • Adopt a Model Ordinance that contains the required elements in Table 2 of the Oregon Plan for NFIP ESA Integration.

• Complete and submit to FEMA an ordinance checklist to demonstrate that new and/or existing local policies address the required elements in Table 2 of the Oregon Plan for NFIP ESA Integration.

• Complete and implement an approved community compliance plan, developed by the local community and approved by FEMA (FEMA may request technical input from NMFS) as meeting the "no net loss" goal at the community level prior to implementation.

• Complete and implement a community-level habitat conservation plan, as outlined in Section 10 of the ESA (or 4(d) if applicable).

Graves Decl. ¶ 205, AR 0018710. *See also* AR 0011497-503 (Draft Integration Plan).[20] With

some variations (e.g*.,* to include an additional option for a community-level conservation plan

pursuant to ESA Section 10), this approach is similar to the "3 Door Compliance Pathway" in

FEMA's implementation plan for the Puget Sound BiOp, which was reviewed and upheld in

*National Wildlife Federation*, 2014 WL 5449859, at *15 ("Having fully considered the scope of

FEMA's 3 Door compliance program, its guidance documentation, and its enforcement

procedures, the Court finds that NWF has failed to meet its burden to show that under Element 3,

FEMA's implementation of the 3 Door compliance program was an abuse of discretion, arbitrary

or capricious, or not in accordance with the law.").[21]

As explained in detail in the Graves Declaration, FEMA has worked to address concerns

raised in the 2016 BiOp regarding measures developed in response to the Puget Sound BiOp as a

---

[20] Plaintiffs incorrectly suggest that FEMA's proposed actions to satisfy RPA Element 4 are deficient because they rely on voluntary actions by the communities. ECF No. 19 at 44. Although communities will have choices among the enumerated options to comply with this RPA element, FEMA has enforcement authority to ensure that each community fulfills its obligation to demonstrate compliance with the conditions of its participation in the NFIP. *See* 44 C.F.R. § 59.24(b)-(c). FEMA will ensure compliance with the Oregon BiOp through these enforcement procedures, as explained in detail in the Graves Declaration. Graves Decl. ¶¶ 141, 211-225, AR 0018702 & 0018713-17.
[21] The 3 Door compliance program in Puget Sound includes:  community adoption of FEMA's Model Ordinance; community reporting that they already had state-mandated ordinances and programs that complied with the RPA; and compliance with the RPA on a permit-by-permit basis. *Nat'l Wildlife Fed'n*, 2014 WL 5449859, at *10.

model for developing Oregon-specific RPA implementation measures. Graves Decl. ¶¶ 133-141, AR 0018700-02. FEMA has developed Oregon-specific guidance on how local floodplain administrators can evaluate the habitat assessments that will be required with applications for floodplain development permits. *Id.* ¶ 134, AR 0018700. This guidance also informs applicants about the information they need to submit in a habitat assessment as part of a complete permit application. *Id.* Finally, the guidance incorporates the specific mitigation ratios included in the 2016 BiOp. *Compare* AR 0000289 and AR 0018657-59 (model ordinance Section 6.1) (updated version available at https://www.fema.gov/sites/default/files/documents/fema_r10_oregon-nfip-esa-model-ordinance_082024.pdf (last visited Sept. 18, 2024)) and AR 0018807 (2024 draft Oregon habitat assessment guide Section 2.5.3) (final version available at https://www.fema.gov/sites/default/files/documents/fema_r10_oregon-habitat-assessment-guide_082024.pdf (last visited Sept. 18, 2024)). FEMA is also implementing measures to provide technical assistance and training to Oregon community officials to implement the program requirements. Graves Decl. § 137, AR 0018701. These actions together address concerns raised by NMFS in the 2016 BiOp concerning community compliance in implementing the Puget Sound BiOp. *See* AR 0000212, 0000286-87, 0000390-98.

Pending completion of an EIS and finalization of the Draft Integration Plan, FEMA satisfies the intent of RPA Element 4 to avoid, minimize, and mitigate the adverse effects of floodplain development on habitat functions and processes via the PICMS, as described above. Again, FEMA already notified communities that they must: (a) prohibit all development in the SFHA until full implementation of the Integration Plan; (b) adopt the NFIP/ESA Model Ordinance for Oregon; or (c) ensure protection of floodplain functions on a permit-by-permit basis. AR 0017877 (Decision Memorandum dated November 27, 2023) (Interim Measure 2).

These measures and the other interim measures are "designed to facilitate the introduction and community implementation of program requirements associated with the permanent program changes currently under NEPA review. . . ." AR 0017885 (Supporting Memorandum dated November 27, 2023). Thus, pending completion of the EIS process, FEMA is complying with RPA Element 4 via the Interim Measure 2 of the PICMs. Because these measures meet the same goals identified in the RPA, FEMA reasonably anticipates that the PICMs will avoid jeopardy to species. AR 0018611. *See also* Graves Decl. ¶ 49, AR 0018680 ("[G]iven the substantial program changes at the national level, the implementation of the interim RPA requirements by themselves will be sufficient to avoid jeopardy to ESA-listed species and habitat.").

### g.    **RPA Element 5**

RPA Element 5 recommended data collection and reporting procedures for FEMA to monitor all participating communities and collect and report floodplain development information.[22] AR 0000303. In satisfaction of RPA Element 5, FEMA's Draft Integration Plan contemplates that FEMA will require that communities submit an annual report to FEMA indicating issuance of each floodplain development permit in the reporting period. Graves Decl. ¶ 210, AR 0018711-12. The report will include the metrics for assessing the impacts of floodplain development on species as included in the 2016 BiOp. *Id.* Prior to implementation, FEMA must obtain approval for its use from the Office of Management and Budget pursuant to the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq. Graves Decl. ¶ 209, AR 0018711.

In the meantime, pending completion of an EIS and finalization of the Draft Integration Plan, FEMA satisfies the intent of RPA Element 5 via the data-collection component of the

---

[22] The RPA contemplated community reporting to FEMA concerning permits issued for development in special flood hazard areas on a quarterly basis and that FEMA report to NMFS annually on RPA implementation status. AR 0000304.

PICMs. *See* AR 0018611 ("Because these interim measures will meet the same goals identified in RPA 2, we reasonably anticipate that the pre-implementation compliance measures will avoid jeopardy."). As explained above, FEMA will require that communities report on the implementation of the pre-implementation compliance measures in their management of floodplain development. AR 0017877 (Decision Memorandum dated November 27, 2023). FEMA has developed a reporting tool to facilitate this process. *See* AR 0018726 (Oregon Reporting Tool Screenshots).

### h.     RPA Element 6

RPA Element 6 recommends compliance and enforcement provisions under which FEMA may ensure that participating communities in Oregon are compliant with the floodplain management criteria pursuant to the RPA. AR 0000305. In satisfaction of this element, FEMA has an established compliance and enforcement strategy that can be extended to ensure communities implement measures in compliance with the ESA, to ensure the continued existence of threatened and endangered species while simultaneously reducing flood risks to life and property. Graves Decl. ¶ 211-22, AR 0018713-16. The BiOp implementation measures incorporated into NFIP community programs in Oregon will be subject to the same level of review as other program activities subject to review for compliance determinations. *Id*. ¶ 223, AR 0018716.[23] Subject to finalization of the Draft Integration Plan, these actions will satisfy the intent of RPA Element 6 to ensure that participating communities in Oregon are compliant with the floodplain management criteria pursuant to the RPA. AR 0000305.

---

[23] FEMA plans to utilize community assistance contacts ("CACs") as an alternative approach to the 25 annual community assistance visits ("CAVs") recommended in NMFS RPA Element 6. *Id.* ¶ 224, AR 0018717. FEMA will conduct 20-30 CACs in 2025 in the highest priority Oregon communities. AR 0017877 (Decision Memorandum dated November 27, 2023). The Graves Declaration explains these CACs promise improved compliance as compared to CAVs. *See* Graves Decl. ¶ 224, AR 0018717.

In sum, pending finalization of the Integration Plan and full implementation of RPA Elements 3-6, FEMA has reasonably determined that it has taken alternative, reasonably adequate steps consistent with NMFS's recommended RPA Element 2 to insure that it does not violate the ESA. *Tribal Vill. of Akutan*, 869 F.2d at 1193; *Nat'l Wildlife Fed'n*, 2014 WL 5449859, at *6. As explained above, FEMA's decision to depart from the precise terms of the RPA in certain instances (e.g., providing communities with three options to ensure that their local land use decisions do not result in ESA violations, rather than requiring communities to make specific permitting decisions) are "well reasoned and supported by the record." *Tribal Vill. of Akutan*, 869 F.2d at 1194. Here, as in the case reviewing FEMA's actions pursuant to an RPA concerning implementation of the NFIP in Washington, "FEMA has demonstrated through the record why it believes that it has either complied with the RPA or why it lacks statutory authority to fully implement sub-elements of the RPA." *Nat'l Wildlife Fed'n*, 2014 WL 5449859, at *21.[24]

Moreover, the NFIP in Oregon is a complex program that relies upon the actions of multiple participating communities. Its implementation involves highly technical agency judgments involving hydrology, floodplain management, actuarial risk, and multiple different local building code ordinances. Where an agency's technical expertise is involved to such an extent, the Court should zealously guard the agency's discretion. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989). Here, it is FEMA, not Plaintiffs, that best understands this complex

---

[24] The facts here are distinguishable from *Northwest Environmental Defense Center*, 479 F. Supp. 3d 1003, cited by Plaintiffs at ECF No. 19 at 40, in which the court held that the Corps of Engineers had failed to take "alternative, reasonably adequate steps" to ensure against jeopardizing listed salmonids, and its departure from the RPA was not "well reasoned [nor] supported by the record." (quoting *Tribal Vill. of Akutan*, 869 F.2d at 1193-94). Here, FEMA has shown that its actions pursuant to the PICMS ensure that FEMA's implementation of the NFIP in Oregon does not cause jeopardy to ESA-listed species or adverse modification of their habitat within the Action Area covered by the Oregon BiOp in a manner consistent with FEMA's legal authorities. Graves Decl. ¶ 142, AR 0018701-02.

federal-state-local partnership and knows how to implement the RPA's requirements within it. The Court should decline Plaintiffs' attempt "to substitute its judgment for that of the agency" as to how best to implement the RPA within the NFIP. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980). Thus, to the extent the parties disagree as to the technical feasibility of certain provisions of the RPA within the confines of the complex federal-state-local partnership outlined by the NFIP, FEMA's expertise should be given deference. *Balt. Gas & Elec. Co.*, 462 U.S. at 103. The Court's review of FEMA's actions should also be informed by FEMA's reasoned determinations as to the most efficient and effective means to implement certain RPA elements. *See Nat'l Wildlife Fed'n,* 2014 WL 5449859, at *20 ("Considering NMFS's statement that 'there are better venues among federal agencies to address implementation of the standards contained in [Element 5]' with FEMA's interpretation of its statutory authority, the Court cannot say that FEMA's implementation of Element 5 was an abuse of discretion or arbitrary and capricious."). Plaintiffs have failed to carry their burden of showing that there has been a "clear error of judgment" on FEMA's part and that FEMA has failed to take such "action necessary to insure" that it will not jeopardize the continued existence of ESA-listed species or adversely modify designated critical habitat. *Nat'l Wildlife Fed'n,* 2014 WL 5449859, at *21 ("Plaintiff has failed to demonstrate that FEMA's implementation of the NFIP in the Puget Sound Region was an abuse of discretion or arbitrary and capricious under the plain terms of RPA."). The Court should grant summary judgment in favor of FEMA as to Plaintiffs' First Claim for Relief.

D.    **FEMA Has Not Unreasonably Delayed Compliance with its ESA Section 7 Obligations.**

As explained in detail above, Plaintiffs' claims concerning "full implementation" of the RPA are unripe, and the Court lacks jurisdiction to address Plaintiffs' Count Two Claims concerning alleged unreasonable delay with respect to RPA implementation. However, even

assuming, *arguendo,* that the Court has jurisdiction to consider Plaintiffs' unreasonable delay

claims, Plaintiffs fail to show that there has been any unreasonable delay on FEMA's part. Such

a claim pursuant to the APA, 5 U.S.C. § 706(1), would be reviewed based on the factors

enumerated in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C.

Cir. 1984) ("*TRAC*"), *cited in In Re Natural Resources Defense Council, Inc.,* 956 F.3d 1134

(9th Cir. 2020):

> (1)     the time agencies take to make decisions must be governed by a "rule of
> reason";
> (2)     where Congress has provided a timetable or other indication of the speed
> with which it expects the agency to proceed in the enabling statute, that statutory
> scheme may supply content for this rule of reason;
> (3)     delays that might be reasonable in the sphere of economic regulation are
> less tolerable when human health and welfare are at stake;
> (4)     the court should consider the effect of expediting delayed action on
> agency activities of a higher or competing priority;
> (5)     the court should also take into account the nature and extent of the
> interests prejudiced by delay; and
> (6)     the court need not "find any impropriety lurking behind agency lassitude
> in order to hold that agency action is unreasonably delayed."

*Id*. at 1138-39. Application of the *TRAC* factors to this case demonstrates that any perceived

delay on FEMA's part has not been unreasonable and certainly has not been so egregious to

warrant equitable relief.

    The first and second *TRAC* factors are often considered together in that the statutory

scheme often gives context to the applicable "rule of reason." *TRAC*, 750 F.2d at 80; *In Re:*

*United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999). "It is well

established that . . . the reasonableness of the delay must be judged in the context of the statute

which authorizes the agency's action." *Sierra Club v. Thomas*, 828 F.2d 783, 797 (D.C. Cir.

1987) (cleaned up). In the present case, consideration of the first two *TRAC* factors demonstrates

that FEMA's delay has not been unreasonable. The ESA itself does not impose a deadline for an

agency to take action in response to a NMFS-recommended RPA. To the contrary, FEMA's decision to take actions in response to the NMFS-recommended RPA has triggered an additional, time-consuming NEPA review that must be completed before FEMA proceeds with full RPA implementation. As described in detail above, FEMA has already taken measures consistent with RPA Elements 1 and 2. FEMA has also explained its actions *to date* to implement the remaining RPA Elements 3-6. *See generally* Graves Decl., AR 0018670. In short, FEMA has developed a Draft Integration Plan pertaining to RPA Elements 3-6, subject to completion of the ongoing NEPA process. Thus, with respect to the first and second *TRAC* factors, the record before the Court confirms that any perceived delay in implementing the RPA Elements has not been unreasonable.

The third *TRAC* factor is inapplicable here, because protection of endangered species does not entail regulation for the protection of human health and welfare. By contrast, FEMA's actions pursuant to the NFIA directly implicate human health and welfare. With respect to the fourth *TRAC* factor, given the number of NFIP-participating communities in Oregon and the complexity of the NFIP, FEMA is in the best position to determine the appropriate timing and sequence of RPA compliance measures consistent with its authorities. Furthermore, expediting FEMA's actions with respect to implementation of RPA Elements 3-6 would potentially interfere with FEMA's efforts to comply with NEPA, which FEMA has determined to be necessary prior to finalizing the draft Integration Plan. AR 0009207 (Notice of Intent to prepare an EIS); AR 009014 ("Overall, we believe that the Draft Plan triggers at least three of FEMA's EIS criteria."). Of relevance to the fifth *TRAC* factor, FEMA is appropriately exercising caution in considering the environmental effects of the NMFS-recommended RPA elements via the NEPA process, prior to implementation. In sum, Plaintiffs fail to show that any delay in implementing the

NMFS-recommended RPA or some equivalent action has been unreasonable under the circumstances here.

## VI.    CONCLUSION

FEMA is actively working to ensure continued implementation of the NFIP in Oregon does not jeopardize any threatened or endangered species or adversely modify any designated critical habitat, including implementing PICMs as the agency works through its necessary environmental compliance obligations while it finalizes its Integration Plan. The PICMs satisfy the intent of the corresponding, NMFS-recommended RPA Element 2 to ensure that there is no net loss of floodplain functions from floodplain development. FEMA continues to work to achieve full implementation of the Integration Plan by NFIP-participating communities in Oregon by September 1, 2027, in accordance with the DRRA. Under these circumstances, FEMA is fully complying with its ESA-related obligations. The Court should grant summary judgment in favor of FEMA and deny Plaintiffs' cross-motion for summary judgment. In the alternative, if the Court determines that Plaintiffs are entitled to summary judgment with respect to any of their claims, Federal Defendants concur with Plaintiffs' proposal that the Court allow the parties to separately address remedy in subsequent briefing.

Dated:  September 19, 2024

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
S. JAY GOVINDAN, Chief
NICOLE M. SMITH, Assistant Chief

*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN, Senior Trial Attorney
D.C. Bar No. 470050
Wildlife and Marine Resources Section
4 Constitution Square
150 M Street, N.E.
Washington, D.C. 20002
Tel: 202-305-0204
mark.brown@usdoj.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that, on September 19, 2024, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN