IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, CENTER FOR BIOLOGICAL DIVERSITY, THE CONSERVATION ANGLER, and WILLAMETTE RIVERKEEPER,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,<br><br>Defendants. | Case No. 3:23-cv-1335-SI<br><br>ORDER |

**Michael H. Simon, District Judge.**

Plaintiffs are environmental advocacy organizations suing the Federal Emergency Management Agency ("FEMA"), its Administrator, and the Secretary of the Department of Homeland Security (collectively, "Defendants") to enforce Section 7 of the the Endangered Species Act ("ESA"). Plaintiffs contend that Defendants are operating the National Flood Insurance Program (the "Program") in violation of the ESA, because the National Fish and Wildlife Service ("NMFS") has determined in a Biological Opinion ("BiOp") that the Program, as operated, would jeopardize the continued existence of 16 species of anadromous fish and orca

PAGE 1 – ORDER

whales. In its BiOp, NMFS recommended that FEMA undertake six reasonable and prudent alternative steps to avoid jeopardizing the identified species while operating the Program. FEMA then developed a draft implementation plan and, consistent with its obligations under the National Environmental Policy Act ("NEPA"), is preparing an Environmental Impact Statement ("EIS"). Pending before the Court are the parties' cross-motions for summary judgment. ECF 19, ECF 21. Because Plaintiffs' claims are not yet ripe, the Court construes Defendants' motion as a motion to dismiss, grants it, and denies Plaintiffs' cross-motion as moot.

## STANDARDS

Ripeness is an element of Article III's case-or-controversy requirement that is "closely related" to standing. *Bova v. City of Medford*, 564 F.3d 1093, 1095-96 (9th Cir. 2009) (quoting *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009)). "While standing is primarily concerned with *who* is a proper party to litigate a particular matter, ripeness addresses *when* litigation may occur." *Lee v. Oregon*, 107 F.3d 1382, 1387 (9th Cir. 1997) (emphasis in original) (citing Erwin Chemerinksy, *Federal Jurisdiction* § 2.4, at 98-99 (1989)). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (internal quotation marks omitted)). "If the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Bova*, 564 F.3d at 1096 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

In the administrative law context, ripeness also is rooted in prudential considerations. Ripeness is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and

PAGE 2 – ORDER

its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967)). "Evaluating ripeness in the agency context requires considering '(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.'" *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 870 (9th Cir. 2022) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Because ripeness relates to the Court's subject matter jurisdiction, it is properly raised in a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (explaining that a "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)" (emphasis omitted)). The correct disposition for an unripe claim is dismissal without prejudice. *Hampton v. Pac. Inv. Mgmt. Co.*, 869 F.3d 844, 846 (9th Cir. 2017) ("Dismissals for lack of subject-matter jurisdiction . . . must be without prejudice, because a lack of jurisdiction deprives the dismissing court of any power to adjudicate the merits of the case."). When ripeness is raised on a motion for summary judgment, a district court should construe the motion as being raised under Rule 12(b)(1). *MacKay v. Pfeil*, 827 F.2d 540, 543 (9th Cir. 1987) ("Where subject-matter jurisdiction is lacking, dismissal, not summary judgment, is the appropriate disposition."); *see also S. Pac. Transp. Co. v. City of L.A.*, 922 F.2d 498, 508 (9th Cir. 1990) (collecting cases for proposition that granting summary judgment on unripe claims is reversible error).

PAGE 3 – ORDER

**BACKGROUND**

Under the Endangered Species Act ("ESA"), an expert Federal wildlife agency (the "consulting agency") must designate critical habitat[1] for all endangered or threatened species.[2] Any Federal agency that plans to carry out an activity that may affect an ESA-listed species or critical habitat (the "action agency") must perform a biological assessment. *See* 50 C.F.R. § 402.14. If, from that initial assessment, the action agency concludes that its action "may affect" a listed species or designated critical habitat, then the action agency must meet with a consulting agency. *Id.* The consulting agency will then determine whether the action agency's activity is likely to adversely affect the listed species or its critical habitat. 16 U.S.C. § 1536(a)(2). If it is, the consulting agency must develop a BiOp to determine whether the activity will jeopardize the affected species or result in destruction or adverse modification of the affected critical habitat. *Id.*; 50 C.F.R. § 402.14(g). If the consulting agency determines in the BiOp that the action agency will jeopardize the species or destroy or adversely modify critical habitat, it shall suggest one or more "reasonably prudent alternatives" ("RPA") to the action agency that would avoid such results. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

"[I]f there are 'substantial questions' regarding whether [an] agency's proposed action may have significant impacts" on the environment, it must also issue an EIS pursuant to NEPA. *See Env't Def. Ctr.*, 36 F.4th at 878. After an agency completes an EIS, it must promulgate a

---

[1] Critical habitat is occupied habitat that contains physical or biological features essential to the conservation of a species and may require species management considerations or protection, or unoccupied habitat that the expert agency has determined is essential for the conservation of the species. 16 U.S.C. §§ 1532(5), 1533(a)(3).

[2] An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

public record of decision ("ROD") that explains its findings and any decision it has made regarding its proposed action.[3] "Congress specifically contemplated that an action agency discharging its duties under Section 7 of the ESA would also comply with NEPA by completing an EA [Environmental Assessment] and, if necessary, an EIS." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 642 (9th Cir. 2014). Thus, if an agency decides to implement a BiOp or RPA in response to an ESA consultation, it must comply with NEPA. *See id.* at 646.

On April 14, 2016, after an ESA consultation, NMFS issued a BiOp concerning FEMA's administration of the Program in Oregon. AR 001. In it, NMFS concluded that the Program was likely to jeopardize the continued existence of 16 ESA-listed species of anadromous fish and orca whales. AR 282. Accordingly, NMFS drafted an RPA under which FEMA would undertake to avoid jeopardizing these species. AR 284-85. NMFS estimated that it would take 8.5 years for FEMA to fully implement the RPA.[4] Thus, the 2016 BiOp required that FEMA "demonstrate full program compliance by those communities subject to this RPA" by September 1, 2024. AR 306. During the consultation process, FEMA reviewed drafts of the RPA and raised concerns that

---

[3] *See* 40 C.F.R. § 1505.2. A ROD is "a concise public document summarizing the findings in the EIS and the basis for the [agency's] decision" based on those findings. *See* 32 C.F.R. § 651.26 (describing ROD); 40 C.F.R. § 1505.2(a)-(c).

[4] AR 002 (describing interim measures to minimize ecological harm during "8.5 year time-frame anticipated for FEMA to complete the mapping updates and implement the modifications to the NFIP's minimum criteria and reporting requirements identified in elements 2 through 5 of the RPA."); AR 325 (referencing "8.5 year RPA implementation period"); AR 327 ("[T]ake is expected to occur at declining levels throughout the 8.5 years NMFS projects to achieve full implementation.").

PAGE 5 – ORDER

certain elements of the RPA were not technically feasible to implement or were inconsistent with the National Flood Insurance Act and other legal authorities.[5]

Because of the RPA's 8.5-year implementation timeline, NMFS also suggested that FEMA promptly implement certain interim measures. *See* AR 002. Specifically, the RPA provided a timeline for FEMA to propose "all changes to regulations, policies, procedures, and/or guidance as needed to implement this RPA," AR 287, and "the second element of the reasonable and prudent alternative include[d] measures for more immediate implementation that FEMA should promptly carry out." AR 284. Specifically, the RPA provided:

> In order to meet the expected outcomes of this RPA, *except as otherwise provided below*, all changes to regulations, policies, procedures, and/or guidance as needed to implement this RPA must be in place by:
>
> September 15, 2016, for Element 1.
>
> March 15, 2018, for Element 2, Elements 3.A and 3.E, and Element 5.
>
> January 1, 2019, for any components of Element 4 that FEMA determines can be implemented without regulatory revisions.
>
> September 15, 2019, for any components of Elements 3.B, 3.C, S.D, 3.F, 3.G, and 6 that FEMA determines can be implemented without regulatory revisions.
>
> January 1, 2021, for any components of this RPA that FEMA determines require regulatory revisions.

AR 287 (emphasis added). Other RPA elements also contained their own interim deadlines. Element 3, for example, which requires FEMA to revise its mapping practices for flood hazard

---

[5] *See, e.g.*, AR 777-94 (May 29, 2014 Letter and "Issues of Concern" Table); AR 818-35 (Jan. 14, 2015 Letter and "Issues of Concern" Table); AR 900-19 (June 3, 2015 Letter and "Issues of Concern" Table).

PAGE 6 – ORDER

prone areas, directed the agency to work with the State of Oregon and NMFS to "develop a schedule" for the revision by April 2017. AR 296.

Two years later, Congress passed the Disaster Recovery Reform of 2018 ("DRRA"). *See* Division D of Pub. L. No. 115-254 § 1246, 132 Stat. 3186, 3469 (Oct. 5, 2018). That law added three years to the original implementation deadlines contained in the RPA. *See id.* ("The Administrator shall extend the deadlines to implement the reasonable and prudent alternative outlined in the [2016 BiOp] by up to 3 years from the date of enactment of this Act."). Thus, FEMA's requirement to demonstrate that all Program participating jurisdictions in Oregon have adopted and implemented all requirements from Elements 3 and 4 of the RPA was extended to September 1, 2027. *See* AR 306. Since then, FEMA has published a Draft EIS for public review and comment. *See* 90 Fed. Reg. 41069 (Aug. 22, 2025). The 45-day public-comment period concluded on October 6, 2025, and FEMA is finalizing its EIS. *See generally* ECF 40 (Joint Status Report).

In September 2023, Plaintiffs sued FEMA under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g).[6] ECF 1. Plaintiffs argue that FEMA is violating Section 7 of the ESA by "fail[ing] to complete its implementation of the RPA—despite having seven years to do so—or

---

[6] The ESA allows a citizen to "commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . , who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). "The district courts shall have jurisdiction" over these citizen-suits "without regard to the amount in controversy or the citizenship of the parties," and they may "enforce any such provision or regulation, or to order the Secretary to perform such act or duty." Id. § 1540(g)(1).

to take other protective actions to significantly reduce the impact of its implementation of the [Program] in Oregon." *See id.* ¶ 103.[7]

## DISCUSSION

Plaintiffs' sole remaining claim is that FEMA has "fail[ed] to complete its implementation of the RPA . . . or to take other protective actions to significantly reduce the impact of its implementation of the [Program]" in violation of the ESA. ECF 1 ¶ 103. That challenge, however, is not yet ripe.

ESA claims are reviewed under the APA standard "[i]rrespective of whether an ESA claim is brought under the APA or the citizen-suit provision." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). Typically, only "final agency action" is reviewable under the APA, *see* 5 U.S.C. § 704, which is action that "marks the consummation of the agency's decisionmaking process" and is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). Plaintiffs bring their lawsuit under Section 706(1) of the APA, however, which "provides that a court shall 'compel agency action unlawfully withheld or unreasonably delayed.'" *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1113 (9th Cir. 2025) (quoting 5 U.S.C. § 706(1)). "A claim under § 706(1) can reach only 'discrete agency action' that an agency is 'required to take.'" *Id.* (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)). This is a "limited exception to the finality doctrine" that applies "only when there has been a genuine failure to act." *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999). As the Supreme Court explained in *Norton*, a § 706(1) claim reaches only "agency

---

[7] Plaintiffs originally alleged that FEMA unlawfully delayed or failed to take action in violation of ESA Section 7, but they have voluntarily dismissed that claim. *See* ECF 35.

PAGE 8 – ORDER

action *unlawfully* withheld" and "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act." 542 U.S. at 63-64 (emphases in original; quotation marks omitted). Thus, the Ninth Circuit "has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action 'dressed up as an agency's failure to act.'" *Ecology Ctr.*, 192 F.3d at 926 (quoting *Nevada v. Watkins*, 939 F.2d 710, 714 n.11 (9th Cir. 1991)).

Plaintiffs assert that FEMA is failing to act in violation of Section 7(a)(2) of the ESA by ignoring the interim implementation deadlines in the RPA. At this stage of the litigation, however, these interim deadlines bear little relevance to a failure-to-act analysis because a "departure from the suggestions in the [BiOp] does not by itself constitute a violation of the ESA." *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988). A BiOp issued to an action agency "theoretically serves an 'advisory function,'" because it is the action agency's obligation to comply with the ESA. *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 643 (quoting *Bennett*, 520 U.S. at 169).[8] To determine whether an action agency has violated the ESA, the Court asks whether the agency took "alternative, reasonably adequate steps to [e]nsure the continued existence of any endangered or threatened species." *Tribal Vill. of Akutan*, 869 F.2d at 1193.

---

[8] "The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 643 (quoting *Bennett*, 520 U.S. at 170). *See also San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1170 (9th Cir. 2011) ("[T]he determinative or coercive effect of a Biological Opinion stems directly from the Service's power to enforce the no-take provision in ESA § 9.").

Here, even if FEMA fails perfectly to implement the RPA,[9] the Court cannot yet evaluate whether that action violates the ESA. The Court cannot know whether FEMA's Program implementation is unlawful—*i.e.*, whether it took alternative, reasonably adequate steps to ensure the continued existence of the species at issue in the BiOp—without knowing how FEMA will implement the Program. FEMA also may still implement the RPA (or an equivalent measure) on the RPA's "full program compliance" timeline, by September 1, 2027.[10] Viewed in this context, Plaintiffs' claim under § 706(1) is really a lawsuit "about the sufficiency of an agency action 'dressed up as an agency's failure to act.'" *Ecology Ctr.*, 192 F.3d at 926 (quoting *Nevada*, 939 F.2d at 714 n.11).[11]

The parties likely will soon know how FEMA plans to implement the Program upon completion of its NEPA process. As *amicus curiae* Oregonians for Floodplain Protection note, FEMA has issued a draft EIS and is in the process of completing a final EIS studying the proposed operation of the Program in light of the BiOp. "Congress specifically contemplated that an action agency discharging its duties under Section 7 of the ESA would also comply with

---

[9] Indeed, FEMA stated that it does not know whether it has the funding to implement the RPA as designed. An agency must have a chance to implement alternative measures.

[10] Further, the interim deadlines listed at AR 287 are listed with the limiting language "except as otherwise provided below," and are followed by the "full program compliance" deadline. Although the Court does not conclusively interpret the terms of the RPA, it notes that an APA § 706(1) claim must be predicated on "agency action *unlawfully* withheld," and "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act." *Norton*, 542 U.S. at 63-64. It is, at the very least, unclear whether the "full program compliance" deadline supersedes the interim deadlines in the RPA, and whether the interim deadlines impose mandatory obligations at all.

[11] Although another Court in this District endorsed a claim alleging a Section 7(a)(2) failure to timely implement RPA measures theory in *Northwest Environmental Defense Center v. U.S. Army Corps of Engineers*, 479 F. Supp. 3d 1003 (D. Or. 2020), the Court declines follow that approach in this case, based on Ninth Circuit precedent.

PAGE 10 – ORDER

NEPA by completing an EA and, if necessary, an EIS." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 647-48. The "implementation of a BiOp is a 'major Federal action [ ] significantly affecting the quality of the human environment'" that requires an agency to prepare an EIS. *Id.* at 646. FEMA's NEPA process is mandatory.

Although the NEPA process will soon generate final agency action ripe for review, the draft EIS is not yet reviewable. "Agencies prepare EISs in two stages." *Ctr. for Bio. Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) ("*Bernhardt*") (citing 40 C.F.R. § 1502.9(a)). The first stage—where FEMA is now—is the draft EIS. *Id.*; 40 C.F.R. § 1502.9(b). "The draft examines the scope of the federal action, evaluates the consequences of the action, and includes viable alternatives for the project." *Bernhardt*, 982 F.3d at 734 (citing 40 C.F.R. § 1502.9(b), 42 U.S.C. § 4332(c)). After its draft, "the agency must then '[m]ake diligent efforts to involve the public in preparing and implementing [its] NEPA procedures,' including soliciting public comments where appropriate." *Id.* at 735 (quoting 40 C.F.R. § 1506.6(a)) (brackets in original). An agency then attaches the substantive comments it receives and its responses to them to the final EIS and memorializes its decisions in a ROD. *See id.* The "EIS and [ROD] . . . culminate the agencies' environmental review process" under NEPA. *Env't Def. Ctr.*, 36 F.4th at 868. Thus, as the Ninth Circuit has held in the same procedural context, "[t]here [is] no agency decision to reverse, as a draft EIS is not an agency decision at all." *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing *Bennett Hills Grazing Ass'n v. United States*, 600 F.2d 1308, 1309 (9th Cir. 1979) for the proposition that a draft EIS was not yet subject to judicial review because it was not yet an agency decision).

The three-factor ripeness text also militates against review. Considering the first factor, Plaintiffs argue that delayed review would imperil listed species and their habitats. This potential

PAGE 11 – ORDER

harm, however, is different in kind than the hardship that the ripeness test looks for; the ripeness inquiry asks whether delaying adjudication of the case will cause "hardship of a legal kind, or something that imposes a significant practical harm *upon the plaintiff.*" *See Nat'l Res. Def. Council v. Abraham*, 388 F.3d 701, 706 (9th Cir. 2004); *see also Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158 (1967). Here, Plaintiffs do not explain how delaying adjudication will prejudice them in their pursuit of their claims or affect their primary conduct. Considering the second factor, judicial intervention would inappropriately interfere with further administrative action. A court order now would undermine FEMA's EIS and potentially interfere with compliance efforts aimed at the deadline of September 1, 2027. Finally, considering the third factor, a court's analysis will likely benefit from understanding better what FEMA did during the RPA implementation period when eventually evaluating Plaintiffs' ESA claim. Until there is a final agency action to review or abdication of a specific, non-discretionary task, "the Court has no basis upon which to instruct NMFS . . . to act differently." *Oregonians for Floodplain Prot. v. U.S. Dep't of Com.*, 334 F. Supp. 3d 66, 72-73 (D.D.C. 2018) (dismissing ESA claims for lack of standing and ripeness concerns).[12]

## CONCLUSION

The Court must construe Defendants' motion for summary judgment (ECF 21) as a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. So construed, the Court GRANTS Defendants' motion to dismiss on ripeness grounds. ECF 21. The Court also

---

[12] Plaintiffs argue that this case is distinguishable from *Oregonians for Floodplain Protection* because the plaintiffs there argued that they would be harmed by what FEMA *might* do after the BiOp has been issued. This case, Plaintiffs assert, is about what FEMA already has failed to do under § 706(1). The Court need not reach this argument, however, because it finds that there has not yet been a "genuine failure to act" by FEMA. *See Ecology Ctr.*, 192 F.3d at 926.

DENIES AS MOOT Plaintiffs' cross-motion for summary judgment. ECF 19. Accordingly, the

Court DISMISSES Plaintiffs' Complaint (ECF 1) without prejudice.

IT IS SO ORDERED.

DATED this 30th day of March, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 13 – ORDER